CURTIS ELECTRO LIGHTING, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1933–70. Filed July 30, 1973.

*Burton W. Kanter, Calvin Eisenberg,* and *Donald A. Statland,* for the petitioner.

*Lewis M. Porter, Jr.,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioner's income tax as follows:

| Year | Deficiency | Year | Deficiency |
|---|---|---|---|
| 1957 | $52, 090. 27 | 1963 | $101, 185. 35 |
| 1958 | 79, 288. 38 | 1964 | 84, 816. 75 |
| 1959 | 69, 376. 35 | 1965 | 76, 818. 78 |
| 1960 | 4, 908. 82 | | |

Several adjustments placed in issue by the pleadings have been settled, and the only issue remaining for decision is whether, under section 451(a),[1] the proceeds of business interruption insurance are includable in the gross income of petitioner, an accrual basis taxpayer, in 1960, when a fire in its plant caused a temporary cessation of its business, or in 1961, when the insurance proceeds were received.[2]

FINDINGS OF FACT

Petitioner Curtis Electro Lighting, Inc., is a corporation organized under the laws of Illinois. At the time its petition was filed in this proceeding, its principal office was located in Chicago, Ill. Its corporate income tax returns for the calendar years 1957, 1958, 1959, 1960, 1963, 1964, and 1965 were prepared on the accrual method of accounting and filed with the district director of internal revenue at Chicago, Ill.

Petitioner is engaged in the manufacture and sale of commercial and industrial lighting fixtures and other electrical appliances for home use.

On May 3, 1960, petitioner sustained a substantial fire loss to its plant and facilities located at 1535 South Paulina Street in Chicago. The fire destroyed petitioner's fixed assets and inventory and interrupted its manufacturing operations. As a result of the fire, petitioner was forced to move its operations across the street to space subleased from Borg-Warner Corp. At the time of the fire, petitioner carried policies of insurance against loss from business interruption as well as loss from damage to inventory, fixtures, and the like.

On May 7, 1960, petitioner entered into an agreement with the Underwriters Salvage Co. of Chicago (hereinafter referred to as Underwriters) whereby Underwriters agreed to salvage and sell certain items of petitioner's inventory which were damaged as a result of the fire. For its services, Underwriters was to be paid a commission of 10

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

[2] Most of the facts relevant to this issue are stipulated. The testimony heard in the case related primarily to an issue which was later settled.

percent of the gross sales price. On May 25, 1960, petitioner entered into another agreement with Underwriters whereby it agreed to retain custody of the inventory salvaged by Underwriters for 30 percent of the cost. Payment for the salvaged inventory was to be made at the same time petitioner was to be paid by the insurance companies.

Under an agreement dated May 12, 1960, petitioner retained the services of Fienk & Fienk to serve as a public adjuster to assist it in the settlement of its losses arising from the fire. The fee to be paid Fienk & Fienk was dependent upon the amount collected from all the insurance companies involved and was to be computed in accordance with a table specified in the agreement.

On June 16, 1960, Frank L. Erion Co. (Erion), insurance adjusters, wrote to Associated Agencies, Inc., the insurance carriers' representative, and requested that petitioner present its claim for business interruption.

By letter dated July 1, 1960, Fienk & Fienk forwarded to petitioner proofs of its loss on furniture, fixtures, and machinery totaling $40,466. On August 22, 1960, a proof of inventory loss was submitted.

In a letter dated August 24, 1960, addressed to Associated Agencies, Inc., Erion again requested that petitioner present its claim for business interruption.

On September 28, 1960, petitioner received $12,485.56 as a result of the sale of its damaged inventory.

In substantiation of its claim for business interruption insurance, petitioner prepared and submitted an estimated loss calculation in the amount of $682,799.20, reflecting a total suspension of its business for 8 months. This calculation was based upon net sales during the period from May to December in 1959, the year previous to the fire. In a letter dated October 10, 1960, to Associated Agencies, Inc., Erion advised that petitioner's business interruption claim was being checked by adjusters.

R. J. Baker (Baker), a certified public accountant, was retained by Erion to study petitioner's calculations of its business interruption loss and to prepare a countercomputation on behalf of the insurance companies. Baker submitted a calculation of the loss based on a partial suspension of the business for 5 months, reflecting the loss to be $204,770.14. Baker also prepared a reconciliation of his calculation of the loss with that submitted by petitioner.

At this point, petitioner submitted a new loss calculation based on a partial suspension of business operations for 6 months. This calculation measured the loss at $508,488.65.

Baker then prepared a new loss calculation based on a partial suspension of petitioner's business for 6 months, reflecting a loss of $302,052.66. He also prepared a reconciliation of his calculation with.

petitioner's computation based on a 6-month, partial suspension of business. In response, petitioner prepared its objections to Baker's calculations, showing a difference of $144,063.32 which was attributable to numerous items. These objections reflect that the dispute between the parties as to some items related only to the amount of the allowance but, as to others, involved the propriety of any adjustment at all.

In a letter dated January 18, 1961, Erion advised Associated Agencies, Inc., that it was expected that matters concerning petitioner's claim would be concluded by January 31, 1961.

On January 25, 1961, agreement was reached on the proof of loss concerning petitioner's claim for business interruption. In a letter dated January 31, 1961, Erion advised Associated Agencies, Inc., that the amount of the concluded adjustment was $340,097.84 and submitted, along with the closing papers, its recommendation that payment be made to petitioner in that amount.

Between February 10 and March 20, 1961, petitioner received checks from Associated Agencies, Inc., totaling $340,098.34,[3] as payment on its claim for loss for business interruption due to the fire.

In its income tax return for 1960, petitioner reported a loss of $334,715.04. Its reported cost of goods sold reflects a reduction of $458,496.13, representing "Insurance Recovery on Goods Lost in Fire, May 3, 1960." A casualty deduction of $234,404.30 was claimed with the following explanatory note: "On May 3, 1960 the taxpayer's factory was destroyed by fire. The amount deducted represents the excess of loss over insurance recovery to December 31, 1960."

In its income tax return for 1961, petitioner included in gross income "Insurance Recoveries" of $340,097.84, the amount of the business interruption insurance here in dispute. This item is reflected in Schedule M attached as a part of the 1961 return as an adjustment for tax purposes which was not recorded on petitioner's books.

The notice of deficiency issued to petitioner contains the following:

It is determined that a business interruption insurance recovery in the amount of $340,097.84, received and reported in 1961, accrued as income in 1960. Accordingly, your taxable income for 1960 is increased in the amount of $340,097.84, and your taxable income for 1961 is decreased by a like amount.

OPINION

Section 451(a) prescribes the general rule that any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, "unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period." Since petitioner utilized the

---

[3] The difference between the amount of the agreed liability ($340,097.84) and the total amount of the checks received by petitioner ($340,098.34) is not explained.

accrual method of accounting in computing its taxable income, the principles of that method rather than the actual receipt of the business interruption insurance proceeds govern the year when such proceeds are includable in petitioner's gross income.

The regulations (sec. 1.451–1(a), Income Tax Regs.) contain the following formula for determining the taxable year of inclusion:

Under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. * * *

While the principles stated in this regulation are well settled, their application to the facts of individual cases often presents great difficulty.

In the case of business interruption insurance, the insurance proceeds under this regulation do not accrue until there is an unqualified recognition of liability by the obligor. Furthermore, although the exact amount may not be computed until later, the amount to be received must be susceptible of calculation in the tax year. In other words if accrual is to occur, the taxpayer must have on its own books and records the data needed for a reasonably accurate estimate of the sum to be received in satisfaction of the insurance claim. *Cappel House Furnishing Co.* v. *United States*, 244 F.2d 525, 530 (C.A. 6, 1957). Cf. *Continental Tie & L. Co.* v. *United States*, 286 U.S. 290, 296 (1932).

Respondent takes the position that all the events fixing petitioner's right to receive the insurance proceeds occurred in 1960 and that the amount of the recovery could be ascertained with reasonable accuracy prior to the end of that year. To support this position, respondent argues that the insurance companies requested petitioner to file its claim and never contested their liability, and that all the factors entering into the computation existed during 1960, the year of the fire. On this ground, respondent asks us to hold that the $340,097.84 recovery accrued in 1960, the year of the fire, citing *Cappel House Furnishing Co.* v. *United States*, *supra*, and *Rite-Way Products, Inc.*, 12 T.C. 475 (1949).

The record, however, does not show that the insurance companies, in 1960, acknowledged liability for petitioner's business losses, and we think respondent reads entirely too much into the adjusters' requests that petitioner file its claim. We think the most reasonable interpretation of the stipulated facts is that the insurance companies were notified of the fire and appointed adjusters to handle the anticipated claim. The adjusters then advised petitioner that they were awaiting the presentation of its claim. When the adjusters received the claim, they prepared and exchanged computations with petitioner, but these facts do not show they admitted liability for anything. During the period the computations were being exchanged, the insurance companies retained their freedom to deny any and all liability and, had the matter

subsequently reached litigation, the computations supposedly reflecting offers of compromise would not have been admissible in evidence on behalf of petitioner. McCormick, Evidence 663 (2d ed. 1972).

Indeed, the stipulated fact is that "On January 25, 1961 agreement was reached on the proof of loss concerning * * * [petitioner's] claim for business interruption." Not until then did the adjusters representing the insurance companies commit themselves. Thereafter, in a letter dated January 31, 1961, Erion "submitted along with the closing papers its recommendation that payment be made" to petitioner in the amount of $340,097.84.

If the calculations of the loss at $204,770.14 or at $302,052.66 had been accompanied by a concession of liability in those amounts, leaving open to further negotiation any additional liability, accrual would have occurred to the extent of the agreed liability. See *Maryland Shipbuilding & Drydock Co.* v. *United States,* 187 Ct. Cl. 523, 534, 409 F. 2d 1363, 1369 (1969) ; and *Luckenbach Steamship Co.*, 9 T.C. 662, 675 (1947). But they were not accompanied by such a concession, and those calculations reflected, at most, efforts to compromise a disputed claim, not agreements to liability for any amount. When the regulations and the decided cases speak of a right to receive an amount as the criterion for accrual, they do not refer to an amount, such as this one, which can be realized only by conceding a substantial additional sum believed, in good faith, to be due. Cf. *Maryland Ship-Building & Drydock Co.* v. *United States, supra* at 1367.

Nor were all the factors from which the loss was ultimately computed known in 1960. The parties were in dispute as to whether the loss should be computed on the basis of a partial or complete suspension of the business, whether the period to be covered was 5, 6, or 8 months, and what items would be taken into account in computing the loss. While both parties, near the end of 1960, had used a 6-month, partial-suspension-of-business formula in the last set of calculations, neither party was finally committed to that formula as a basis for settlement. Indeed, even when both parties were using that formula, they were $144,063.32 apart on the amount due petitioner.

That respondent errs in contending that all factors for computing the loss were known in 1960 is demonstrated not only by the dispute as to the period and the nature of the business suspension but by the variety of items composing this $144,063.32 difference. The manner in which adjustments should be made for bad debts, freight out, obsolescence of inventory, labor costs, vacation pay, depreciation, salesmen's samples, and a host of other items was in contest. An examination of petitioner's objections to the insurance adjusters' $302,052.66 calculation shows that the parties disagreed, not only as to the amount of the adjustment for some items but whether any

adjustment at all was appropriate for others. Reconciliation of the differences as to these items does not appear to have involved merely the application of unambiguous insurance policy provisions to known or knowable accounting facts. Rather the differences reflect a dispute as to the extent of the coverage—how numerous disputed items under the terms of the policies should be treated in computing the payment to petitioner.

Respondent emphasizes that a prospectus issued by petitioner's parent corporation in connection with a stock offering contains a consolidated statement of income and retained earnings for the 10 months ended October 31, 1960, which includes an item of income of $340,000 under the heading "Business interruption insurance recovery." A balance sheet in the same document shows this amount as a claim receivable, as does a balance sheet included in petitioner's 1960 income tax return.

However, the prospectus is dated April 6, 1961, after the insurance claim was settled, and petitioner correctly points out that generally accepted auditing standards of reporting require informative disclosure of post-balanced-sheet date events. See Montgomery, Auditing 12, 14, 118–120 (8th ed. 1957); Finney & Miller, Principles of Accounting—Intermediate 62 (5th ed. 1959). In fact, the Securities and Exchange law (Securities Act of 1933, sec. 11, 15 U.S.C.A. 77k) renders every signator of a registration statement, the directors of an issuer, and accountants who prepare registration statements, among others, subject to liability for representations in a registration statement which are untrue as of the "effective" date of the statement. This includes representations which are misleading unless the registration statement reflects events occurring subsequent to the date of the statement. See *Escott* v. *Barchris Construction Corp.*, 283 F. Supp. 643, 676–679, 701–703 (S.D. N.Y. 1968), and Montgomery, Auditing, *supra* at 584, 601–602. We do not think these accounting papers provide any support for respondent's position.

Nor do we think *Cappel House Furnishing Co.* v. *United States*, 244 F. 2d 525 (C.A. 6, 1957), and *Rite-Way Products, Inc.*, 12 T.C. 475 (1949), on which respondent relies, aid his cause. In those cases, there was no dispute as to the liability of the insurance companies, and the courts found the amount of the insurance recovery was ascertainable with reasonable accuracy in the year of the business interruption. For the reasons stated above, as we interpret the stipulation in the present case the insurance companies had not conceded liability, and the amount receivable by petitioner was not ascertainable in 1960.

To reflect the disposition of the issues which have been settled,

*Decision will be entered under Rule 50.*