# CENTRAL TABLET MANUFACTURING CO. *v.* UNITED STATES

No. 73–593. Argued March 25–26, 1974—Decided June 19, 1974

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, MARSHALL, and REHNQUIST, JJ., joined. WHITE, J., filed a dissenting opinion, in which DOUGLAS, BRENNAN, and POWELL, JJ., joined, *post*, p. 691.

*Larry H. Snyder* argued the cause and filed briefs for petitioner.

*Stuart A. Smith* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Assistant Attorney General Crampton,* and *David English Carmack.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

Section 337 (a) of the Internal Revenue Code of 1954, 26 U. S. C. § 337 (a),[1] provides, with stated exceptions, for the nonrecognition of gain or loss from a corporation's "sale or exchange" of property that takes place during the 12-month period following the corporation's adoption of a plan of complete liquidation that is effectuated within that period. The issue in this case is whether, when a fire destroys corporate property *prior* to the adoption of a plan of complete liquidation, but the fire insurance proceeds are received after the plan's adoption, the gain realized is or is not to be recognized to the corporation.

I

The facts are not contested. Taxpayer, Central Tablet Manufacturing Company, an Ohio corporation, for

---

[1] "§ 337. Gain or loss on sales or exchanges in connection with certain liquidations.

"(a) General rule.

"If—

"(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

"(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

"then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period." 26 U. S. C. § 337 (a).

many years prior to May 14, 1966, was engaged at Columbus, Ohio, in the manufacture and sale of writing tablets, school supplies, art materials, and related items. It filed its federal income tax returns on the accrual basis of accounting and for the fiscal year ended October 31.

On August 13, 1965, a majority of the taxpayer's production and maintenance employees went on strike. As a consequence, production was reduced to about 5% of normal volume. On September 10, during the strike, an accidental fire largely destroyed the taxpayer's plant, its manufacturing equipment and machinery, and its business offices. The damage was never repaired, the strike was never settled, and the taxpayer never again engaged in manufacturing.

At the time of the fire, the taxpayer carried fire and extended coverage insurance on its building, machinery, and inventory. It also carried business interruption insurance. Negotiations relating to the taxpayer's claim for business interruption loss began about October 8, 1965, and those on its claims for building and personal property losses began about November 1. There was dispute as to the estimated period of loss to be covered by the business interruption insurance; as to the probable duration of the strike had the fire not taken place; as to the applicability of the building policy's co-insurance clause; as to the extent of the equipment loss due to the fire rather than to rain; as to the value of the building and equipment at the time of the fire; and as to the cost of repair of repairable machinery and equipment. The threshold liability of the insurance carriers, however, despite their not unusual rejection of the initial formal proofs of claim, was never seriously questioned.

Eight months after the fire, at a special meeting on May 14, 1966, the shareholders of Central Tablet decided to dissolve the corporation and adopted a plan of disso-

lution and complete liquidation pursuant to Ohio Rev. Code Ann. § 1701.86 (1964). App. 38. About six days later, the taxpayer and the insurers settled the building claim; payment of that claim was received in mid-June. In August, the taxpayer settled its personal property claim and received payment on it in November. On May 3, 1967, all assets remaining after liquidating distributions to the shareholders were conveyed to a Columbus bank in trust for the shareholders pending the payment of taxes and the collection of remaining insurance and other claims. On the same date, the taxpayer filed a certificate of dissolution with the Ohio Secretary of State. Ohio Rev. Code Ann. §§ 1701.86 (H) and (I) (1964). All this was accomplished within 12 months of the adoption of the plan on May 14, 1966.

The business interruption claim was settled in August 1967 and payment thereof was received in September of that year.

The fire insurance proceeds exceeded the taxpayer's adjusted income tax basis in the insured property. Gain, therefore, was realized and ordinarily would be recognized and taxed to the corporation. § 1033 (a)(3) of the 1954 Code, 26 U. S. C. § 1033 (a)(3); *Tobias* v. *Commissioner,* 40 T. C. 84, 95 (1963). The taxpayer, however, resorting to § 337 (a), did not report this gain or any part of the business interruption insurance payment in its income tax returns for fiscal 1965 or for any other year. In January 1968, upon audit, the Internal Revenue Service asserted a deficiency in the taxpayer's income tax for fiscal 1965. This was attributable to the Service's inclusion in gross income for that year of (a) capital gain equal to the excess of the fire insurance proceeds over adjusted basis, (b) fiscal 1965's pro rata share of the business interruption insurance payment, and (c) an amount not at issue here. A deficiency in the taxpayer's fiscal

1963 tax was also asserted; this was attributable to a decrease in operating loss carryback from fiscal 1966 because of adjustments in the treatment of the insurance proceeds.[2] The taxpayer paid the deficiencies, filed claims for refund, and, in due time, instituted the present action in federal court to recover the amounts so paid.

The District Court followed the decision in *United States* v. *Morton,* 387 F. 2d 441 (CA8 1968), which concerned a taxpayer on the cash, rather than the accrual, basis, and held that § 337 (a) was available to the taxpayer. 339 F. Supp. 1134 (SD Ohio 1972).[3] Judgment for the taxpayer was entered. On appeal, the United States Court of Appeals for the Sixth Circuit, refusing to follow *Morton,* reversed and remanded. 481 F. 2d 954 (1973). In view of the indicated conflict in the decisions of the Eighth and Sixth Circuits, we granted certiorari. 414 U. S. 1111 (1973).

## II

The only issue before us is whether § 337 (a) has application in a situation where, as here, the involuntary conversion occasioned by the fire preceded the adoption of the plan of complete liquidation.[4] This depends upon whether the "sale or exchange," referred to in § 337 (a),

---

[2] The deficiencies, including interest, amounted to $70,051.30 for fiscal 1965 and $11,930.30 for fiscal 1963.

[3] *Kinney* v. *United States,* 73–1 U. S. Tax Cas. ¶ 9140 (ND Cal. 1972), decided before the Sixth Circuit's ruling in the present case, and now on appeal to the Ninth Circuit, also followed *Morton.* The corporate taxpayer in *Kinney* was on the accrual basis.

[4] Because the District Court ruled that § 337 (a) had application to Central Tablet's situation, there was no occasion for it to determine in what taxable year the gain to the corporation accrued if it were ultimately decided that § 337 (a) was not applicable. That question remains for resolution upon remand. We intimate no view as to that issue. See generally 2 J. Mertens, Law of Federal Income Taxation § 12.65 and p. 236 (Malone rev. 1967).

took place when the fire occurred or only at some post-plan point, such as the subsequent settlement of the insurance claims, or their payment.

Stated simply, it is the position of the Government that the fire was a single destructive event that effected the conversion (and, therefore, the "sale or exchange") prior to the adoption of the plan of liquidation, thereby rendering § 337 (a) inapplicable. It is the position of the taxpayer, on the other hand, that the fire was not such a single destructive event at all, but was only the initial incident in a series of events—the fire; the preparation and filing of proofs of claim; their preliminary rejection; the negotiations; ultimate dollar agreement by way of settlement; the preparation and submission of final proofs of claim; their formal acceptance; and payment—that stretched over a period of time and came to a meaningful conclusion only *after* the adoption of the plan, and that, consequently, § 337 (a) is applicable.

In order to keep this narrow issue in perspective, it is desirable and necessary to examine the background and the history of § 337.

A corporation is a taxable entity separate and distinct from its shareholders. Ordinarily, a capital gain realized by the corporation is taxable to it. The shareholders, of course, benefit by that realization of gain and the consequent increase in their corporation's assets. The value of their shares, in theory, is thereby enhanced. This increment in value, however, is not taxed at that point to the shareholder. His taxable transaction occurs when he disposes of his shares. The capital gain realized by the corporation, and taxed to it, may be said to be subject to a "second" tax later, that is, when the shareholder disposes of his shares. There is nothing unusual about this. It is a reality of tax law, and it is due to the separateness of the corporation and the shareholder as taxable entities.

This "double tax" possibility took on technical aspects, however, when the capital gain was realized at about the time of, or in connection with, a corporation's liquidation. If liquidation was deemed to have taken place subsequent to the sale or exchange, there was a "second" tax to the shareholder in addition to the tax on the gain to the corporation. On the other hand, because a corporation itself realizes no gain for income tax purposes upon the mere liquidation and distribution of its assets to shareholders, § 311 of the 1954 Code, 26 U. S. C. § 311; see *General Utilities Co.* v. *Helvering,* 296 U. S. 200 (1935), if the liquidation was deemed to have preceded the sale or exchange of the asset, there was no "first" tax to the corporation. Thus, the timing of the gain transaction, in relation to the corporation's liquidation, had important tax consequences. See generally B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders 11–53 (3d ed. 1971). In short, before § 337 came into the Internal Revenue Code, the overall income tax burden for the liquidating corporate taxpayer and its shareholders was less if the corporation clearly made its distribution of assets prior to the sale or exchange of any of them at a gain.

All this seemed simple and straightforward. The application of the rule, however, as fact situations varied, engendered profound confusion which was enhanced by two decisions by this Court approximately 25 years ago. In *Commissioner* v. *Court Holding Co.,* 324 U. S. 331 (1945), the Court held that a liquidating corporation could not escape taxation on the gain realized from the sale of its sole asset if the corporation itself had arranged the sale prior to liquidation and distribution of the asset to the shareholders. This was so even though the sale was consummated after the distribution. Subsequently, in *United States* v. *Cumberland Public Service Co.,* 338

U. S. 451 (1950), the Court reached exactly the opposite conclusion in a case where the shareholders, rather than the corporation, had negotiated the sale of the distributed assets and, prior to the corporation's liquidation, had been in touch with the purchaser and had offered to acquire the property and sell it to the purchaser. Mr. Justice Black, who wrote for a unanimous court in both cases, recognized that "the distinction between sales by a corporation as compared with distribution in kind followed by shareholder sales may be particularly shadowy and artificial when the corporation is closely held," *id.,* at 454–455, but the Court, nonetheless, determined that the distinction was mandated by the Code:

> "The oddities in tax consequences that emerge from the tax provisions here controlling appear to be inherent in the present tax pattern. For a corporation is taxed if it sells all its physical properties and distributes the cash proceeds as liquidating dividends, yet is not taxed if that property is distributed in kind and is then sold by the shareholders. In both instances the interest of the shareholders in the business has been transferred to the purchaser. . . . Congress having determined that different tax consequences shall flow from different methods by which the shareholders of a closely held corporation may dispose of corporate property, we accept its mandate." *Id.,* at 455–456.

These two cases obviously created a situation where the tax consequences were dependent upon the resolution of often indistinct facts as to whether the negotiations leading to the sale had been conducted by the corporation or by the shareholders. Particularly in the case of a closely held corporation, where there was little, if any, significant difference between management and ownership, this analytical formalism was unsatis-

factory and, indeed, was a trap for the unwary. S. Rep. No. 1622, 83d Cong., 2d Sess., 49 (1954); H. R. Rep. No. 1337, 83d Cong., 2d Sess., A106 (1954). See Cary, The Effect of Taxation on Selling Out a Corporate Business for Cash, 45 Ill. L. Rev. 423 (1950).

It was in direct response to the *Court Holding-Cumberland* confusion and disparate treatment that Congress produced § 337 of the Internal Revenue Code of 1954. The report of the House Committee on Ways and Means on the bill (H. R. 8300) which became the 1954 Code explained the purpose of § 337:

> "Your committee's bill eliminates questions arising as a result of the necessity of determining whether a corporation in process of liquidating made a sale of assets or whether the shareholder receiving the assets made the sale. Compare *Commissioner* v. *Court Holding Company* (324 U. S. 331), with *U. S.* v. *Cumberland Public Service Company* (338 U. S. 451). This last decision indicates that if the distributee actually makes the sale after receipt of the property then there will be no tax on the sale at the corporate level. In order to eliminate questions resulting only from formalities, your committee has provided that if a corporation in process of liquidation sells assets there will be no tax at the corporate level, but any gain realized will be taxed to the distributee-shareholder, as ordinary income or capital gain depending on the character of the asset sold."
> H. R. Rep. No. 1337, 83d Cong., 2d Sess., 38–39 (1954).

See also *id.*, at A106–A109, where it was said, at A106: "Your committee intends in section [337] to provide a definitive rule which will eliminate any uncertainty." See S. Rep. No. 1622, 83d Cong., 2d Sess., 48–49, 258–260 (1954).

There is nothing in the legislative history indicating that § 337 was enacted in order to eliminate "double taxation" as such. Rather, the statute was designed to eliminate the formalistic distinctions recognized and perhaps encouraged by the decisions in *Court Holding* and *Cumberland*. See Kovey, When Will Section 337 Shield Fire Loss Proceeds? A Current Look at a Burning Issue, 39 J. Taxation 258, 259 n. 2 (1973); Note, Tax-Free Sales in Liquidation Under Section 337, 76 Harv. L. Rev. 780 (1963). See also *West Street-Erie Boulevard Corp.* v. *United States*, 411 F. 2d 738, 740–741 (CA2 1969). The statute was meant to establish a strict but clear rule, with a specified time limitation, upon which planners might rely and which would serve to bring certainty and stability into the corporation liquidation area. The taxpayer here recognizes this statutory purpose. Brief for Petitioner 6–7; Tr. of Oral Arg. 3–4.

Inasmuch as § 337 was drafted to meet and deal with the *Court Holding-Cumberland* situation, where there had been a sale, the statute on its face relates only to "the sale or exchange" of property. It is not surprising, therefore, that further confusion resulted when the Internal Revenue Service found itself confronted by liquidating corporate taxpayers who sought § 337 (a) treatment for casualty gains. Following the Court's decision in *Helvering* v. *William Flaccus Oak Leather Co.,* 313 U. S. 247 (1941),[5] the Internal Revenue Service at first refused to consider § 337 as applicable to a casualty situation at all. Rev. Rul. 56–372, 1956–2 Cum. Bull. 187.

---

[5] In *Flaccus* the Court held that fire insurance proceeds did not result in gain from a "sale or exchange" of capital assets within the meaning of § 117 (d) of the Revenue Act of 1934, 48 Stat. 715. This result was overcome statutorily by the enactment of § 151 (b) of the Revenue Act of 1942, 56 Stat. 846, now carried over into § 1231 (a) of the 1954 Code, 26 U. S. C. § 1231 (a).

When this was rejected in the courts,[6] the Service reversed its position and treated an involuntary conversion that occurred after adoption of a plan of complete liquidation as a "sale or exchange" with resulting nonrecognition. Rev. Rul. 64–100, 1964–1 Cum. Bull. (Part I) 130.

It is at this point that the issue of the instant case emerges and comes into focus. Although it is now settled that an involuntary conversion by fire is a sale or exchange under § 337 (a), the question that is determinative here remains unresolved: When does the involuntary conversion by a preplan fire take place? Since the statute prescribes a strict 12-month postplan period, it is crucial for the taxpayer that the conversion be deemed to have occurred after the plan of liquidation was adopted.

## III

Predictably, the taxpayer analogizes the involuntary conversion to a true sale, and it argues that the conver-

---

[6] *Towanda Textiles, Inc.* v. *United States*, 149 Ct. Cl. 123, 180 F. Supp. 373 (1960); *Kent Mfg. Corp.* v. *Commissioner*, 288 F. 2d 812 (CA4 1961). In each of these cases the court relied upon the *Flaccus*-inspired statutory amendment, referred to in the preceding footnote, for its conclusion that an involuntary conversion was covered by § 337 (a). In *Towanda* the Court of Claims permitted § 337 (a) treatment where both the fire and the settlement occurred during the 12-month period *following* the adoption of the plan of liquidation. It observed, "It is not conceivable that Congress would have drawn a distinction between a gain from a voluntary conversion and an involuntary one, had the possibility of an involuntary conversion *during* liquidation come to its attention" (emphasis supplied). 149 Ct. Cl., at 129, 180 F. Supp., at 376. In *Kent*, the Fourth Circuit disallowed § 337 (a) treatment where both the fire and the settlement took place *prior* to the adoption of a plan of liquidation. 288 F. 2d, at 816. (It upheld that taxpayer's argument, however, that the casualty gain there sustained was entitled to nonrecognition specially provided under § 392 (b) of the 1954 Code.) Neither case presented the factual sequence of the case before us.

sion does not occur until settlement is reached and the insurance obligations are finally determined and paid. This essentially is the reasoning employed in the *Morton* case.

There is nothing to indicate that Congress considered this problem when § 337 (a) was adopted. The fact that attention was invariably focused on an actual sale would indicate that the casualty situation was not legislatively anticipated. *Towanda Textiles, Inc.* v. *United States,* 149 Ct. Cl. 123, 129, 180 F. Supp. 373, 376 (1960). Recourse to legislative history, therefore, is somewhat circumstantial in nature. There is, however, one guiding fact, namely, the above-mentioned clear purpose of Congress, in its enactment of § 337 (a), to avoid the *Court Holding-Cumberland* formalities.

The taxpayer's analogy to the ordinary sale transaction has some superficial appeal. It fails, however, to give sufficient consideration to the underlying purpose of § 337 (a). To be sure, under normal circumstances, a true sale is not complete until the mutual obligations (if not the precise terms) are fixed. The Internal Revenue Service has recognized this explicitly in the Regulations by making § 337 (a) available where a sale is negotiated by the corporation prior to the adoption of the plan but is not completed until after the plan is adopted. Treas. Reg. § 1.337–2 (a).[7] This merely acknowledges

---

[7] The Regulations make the date of the sale dependent "primarily upon the intent of the parties to be gathered from the terms of the contract and the surrounding circumstances." § 1.337–2 (a). They provide that an "executory contract to sell is to be distinguished from a contract of sale." This distinction recognizes the significance of the point in time where the parties can no longer opt out of a transaction. Certainly, a fire insurer has no right to opt out of its coverage and basic liability after the fire takes place; in this respect, the executory contract situation referred to in the Regulations is distinguishable.

that the parties are free to avoid an executory sales contract until it is made final. If the transaction is not completed until after the plan of liquidation is adopted, the corporation is rightfully entitled to § 337 (a) treatment. This result is fully consistent with the aim of Congress to avoid the factual determination that led to the *Court Holding-Cumberland* dichotomy. The fact that the corporation and its shareholders are given this limited opportunity to plan, preliminary and prior to liquidation, for disposal of assets does not mean that the Congress intended to make this opportunity available in every conceivable fact situation.

With a fire loss, the obligation to pay arises upon the fire.[8] Unlike an executory contract to sell, the casualty cannot be rescinded. Details, including even the basic question of liability, may be contested, but the fundamental contractual obligation that precipitates the transformation from tangible property into a chose in action consisting of a claim for insurance proceeds is fixed by the fire. Although the parties remain free to arrive at an acceptable settlement, the obligation itself has come into being, and it is the value of the insured property at that point that governs the claim. In other words, the terms of the obligation cannot be changed unilaterally by the insurer once the fire has occurred.

The fact that the ultimate extent of the gain may not be known or final settlement reached until some

---

[8] For tax purposes, the formality of filing a proof of claim usually does not change the substance of this conclusion. In any event, the formalities were observed here. The insurer's adjuster was in attendance even while the fire was in progress. App. 42. Notice was immediately given the insurance companies and proofs of loss were promptly submitted. *Id.*, at 13–14. Negotiations began within a month. The adjusters, in making the not uncommon rejection of initial proofs of claim, denied the extent, but hardly the fact, of coverage. *Id.*, at 14–15.

later time does not prevent the occurrence of a "sale or exchange" even in the context of a normal commercial transaction. See, *e. g., Burnet* v. *Logan,* 283 U. S. 404 (1931). The taxpayer's efforts to draw an analogy to a true sale is therefore of limited utility. See Note, Involuntary Conversions and § 337 of the Internal Revenue Code, 31 Wash. & Lee L. Rev. 417, 427–428 (1974).

When the casualty occurs during the 12-month period after the plan of liquidation is adopted, § 337 (a)'s applicability follows as a matter of course. The presence of § 337 (a) creates an expectation in the liquidating corporation that it will not be taxed on gains from sales or exchanges of corporate assets during the 12-month period. The taxpayer corporation then need not be concerned with the formalities of sale and disposal in order to avoid tax on capital gains. Put another way, once the plan is adopted, corporate property is colored with the reasonable expectation that if it is sold or exchanged within 12 months, any resulting gain will not be taxed to the corporation. It follows that if, after the plan is adopted, property is destroyed by casualty, with consequent replacement by insurance proceeds, § 337 (a) treatment is available. The property colored by the expectation has been replaced by insurance proceeds.

When, however, the casualty occurs prior to the adoption of the plan and the corporation's commitment to liquidate, none of these considerations attaches. Moreover, there is nothing in the purpose of § 337 which dictates the extension of its benefits to this preplan situation. Before the adoption of the plan the corporation has no expectation of avoiding tax if it disposes of property at a gain. The corporation, of course, is the beneficiary of the insurance, and both at the time the policy is executed and at the time of the fire, the destroyed property is an asset of the corporation. Prior to the

adoption of the plan, § 337 (a)'s "expectation" simply is not present. For all practical purposes, the disposal of Central Tablet's insured property occurred at the time of its fire. At that time the taxpayer possessed all incidents of ownership. It had evidenced no intention to liquidate. The fire was irremediable. Regardless of the formalities and negotiations that prefaced the actual insurance settlements, the property was parted with at the time of its destruction. When the casualty occurs prior to the corporation's committing itself to liquidation, no *Court Holding-Cumberland* problem is presented.

## IV

This interpretation is fully consistent with the manner in which condemnation, the other principal form of involuntary conversion, is treated under § 337. In condemnation, the legally operative event for purposes of the statute is the passage of title under federal or state law, as the case may be, to the condemning authority. This means that in many jurisdictions the "sale or exchange" under § 337 (a) occurs prior to the determination of the amount of condemnation compensation and, indeed, possibly without advance warning to the corporation owner. Rev. Rul. 59–108, 1959–1 Cum. Bull. 72. It has been uniformly recognized that a corporate taxpayer may not avail itself of § 337 (a) where its plan of liquidation is adopted after title has passed by way of condemnation even where no settlement as to condemnation price has been reached or where the corporation had no advance notice of the proposed taking. *Covered Wagon, Inc.* v. *Commissioner,* 369 F. 2d 629, 633–635 (CA8 1966); *Likins-Foster Honolulu Corp.* v. *Commissioner,* 417 F. 2d 285 (CA10 1969), cert. denied, 397 U. S. 987 (1970); *Dwight* v. *United States,* 328 F. 2d 973 (CA2 1964); *Wendell* v. *Commissioner,* 326 F. 2d 600 (CA2

1964). The taxpayer's position here would favor the casualty taxpayer over the condemnation taxpayer.

Although perhaps not an exact parallel, the one date in the casualty loss situation analogous to the passage of title in the condemnation context is the date of the casualty. The fire is the event which fixes the legal obligation to pay the insurance proceeds. As with a non-qualifying preplan condemnation, the fire is the single irrevocable event of significance, and it occurs when title and control over the property are in the corporation. The chose in action against the insurer arises at that time. This is unlike the executory sales contract consummated after the adoption of a plan; there, either of the parties is free unilaterally to avoid whatever preliminary agreement had been reached at the preliquidation negotiations. As with condemnation, the involuntary character of the fire distinguishes it from the normal sale, and, as with condemnation, for purposes of § 337 (a), it is irrelevant that the precise dollar amount of the insurer's obligation remains uncertain. In the casualty situation, the owner of the insured property is deprived of aspects of ownership when the fire occurs in much the same way as the owner of condemned property is deprived at the time title passes. In each case the triggering event is involuntary and irrevocable. Because of the statutorily imposed chronology, the event operates to prevent the corporation's receiving the favorable treatment of § 337 (a). As the *Court Holding* decision exemplifies, "This may appear a harsh result, but if it is to be corrected Congress must act; the courts have no power to do so." *Dwight* v. *United States,* 328 F. 2d, at 974.

V

Again, although not precisely parallel and certainly not controlling, concluding that the "sale or exchange" takes place at the time of the fire is consistent with the ac-

cepted method for determining the holding period of destroyed property in the ascertainment of its long- or short-term capital gain or loss consequences. Where property is destroyed, the holding period terminates at the moment of destruction. *Rose* v. *United States*, 229 F. Supp. 298 (SD Cal. 1964); *Steele* v. *United States*, 52–2 U. S. Tax Cas. ¶ 9451 (SD Fla. 1952); see *Draper* v. *Commissioner*, 32 T. C. 545, 548–549 (1959). Cf. Comment, Extending Section 337 to Liquidations Triggered by the Involuntary Conversion of Corporate Assets, 62 Geo. L. J. 1203, 1213 n. 55 (1974). Were we to accept the taxpayer's argument, we would be left with the anomalous situation of having the "sale" take place after the holding period has terminated for capital gain or loss purposes.

## VI

The situation presented by the instant case has been brought to the attention of Congress with the suggestion that the nonrecognition treatment provided by § 337 (a) be extended to preplan involuntary conversions.[9] Con-

---

[9] In 1959 the Advisory Group made the following recommendation to the House Committee on Ways and Means:

"The advisory group considers it appropriate and desirable to extend the nonrecognition treatment provided by section 337 (a) to all involuntary conversions. Since an involuntary conversion cannot be foreseen and it is impractical to require adoption of the liquidation plan on or before the day of the conversion, it is proposed, as to such conversions, to relax the strict requirements of the section with respect to the time of adoption of the liquidation plan. Since the time of receipt of the proceeds of an involuntary conversion may depend on factors beyond the control of the corporation and receipt within a 12-month period is often impossible, it is proposed also to relax the distribution requirements with respect to such conversions. Accordingly, it is recommended that an involuntary conversion within the meaning of section 1033 be considered a sale or exchange for purposes of section 337, and that the requirements of paragraph (1)(B) regarding the time of distribution, and the requirement of

gress, however, has not acted on this suggestion. It, of course, has provided some tax relief to the victim of a casualty gain by permitting nonrecognition of the gain if the victim-taxpayer uses the proceeds to replace the destroyed property in a specified manner. § 1033 (a)(3) of the 1954 Code, 26 U. S. C. § 1033 (a)(3). But Congress has never disclosed an intention to permit the corporate victim of a casualty with ensuing gain to have the option of liquidating after the casualty occurs and obtaining the benefit of nonrecognition under § 337 (a). If this is desirable policy, it is for the Congress, not the courts, to effectuate. The fact that a tax-oriented and tax-knowledgeable corporation in theory could utilize § 1033 (a)(3) and rebuild with its insurance proceeds without being taxed for the gain, and then adopt a plan of liquidation, surely does not change the result. Tax consequences follow what has taken place, not what might have taken place. *Commissioner* v. *National Alfalfa Dehydrating & Milling Co.,* 417 U. S. 134, 148–149 (1974).

---

paragraph (1) that the sale or exchange occur within the 12-month period referred to therein, be considered satisfied if such 12-month period begins not later than 60 days after the disposition of the converted property, as defined in section 1033 (a)(2), and the proceeds of the conversion are distributed within such 12-month period or within 60 days after the receipt thereof by the corporation, whichever is later." Hearings on Advisory Group Recommendations on Subchapters C, J, and K of the Internal Revenue Code before the House Committee on Ways and Means, 86th Cong., 1st Sess., 532 (1959). It is true that this recommendation was made before the Internal Revenue Service had recognized a casualty as a "sale or exchange," within the language of § 337 (a), and that the Service has adopted at least part of the recommendation without congressional action. Nonetheless, the Advisory Group clearly recognized that even if the involuntary conversion were a "sale or exchange," § 337 (a) did not reach the conversion that occurred prior to the adoption of the plan of liquidation, and it proposed "to relax the strict requirements of the section" with respect thereto.

Had Congress enacted § 337 for the avowed purpose of freeing a corporation from tax on gains whenever it decides to liquidate, the result here might well be different. Section 337, however, was not designed to accomplish that broad result. As has been noted, § 337 was designed for the limited purpose of avoiding the technical and formalistic determination of control as between the corporation and the shareholders. By the enactment of § 337 (a), the benefit of any existing doubt in that context was given to the corporate taxpayer. But § 337 (a) is narrowly and specifically drawn. It applies only to a complete liquidation and then only to one fully accomplished in a specified short time. It has no application to a sale or exchange before the adoption of the plan or to one more than 12 months after the adoption. If the statute's precise conditions are not fulfilled, the tax consequences that normally prevail will ensue. Indeed, the statute is not always beneficial, for it operates to make a loss as well as a gain on the sale or exchange nonrecognizable.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

Mr. Justice White, with whom Mr. Justice Douglas, Mr. Justice Brennan, and Mr. Justice Powell join, dissenting.

Ordinarily, gain from the sale of corporate property is taxed to the corporation. Under 26 U. S. C. § 337, however, gain from a sale or exchange occurring within 12 months after the adoption of a plan of liquidation is not recognized or taxed to the corporation. Concededly, the section applies to gain from involuntary conversions such as fire losses compensated by insurance, as long as the event qualifying as the sale or exchange takes place after, rather than before, the adoption of a plan of liquida-

tion.   As the Court indicates, the sole issue in this case is when the sale or exchange occurred.

Here, the fire took place on September 10, 1965.   The plan of liquidation was not adopted until May 14, 1966. But the destroyed property was insured, and the insurance claims were finally negotiated, settled, and paid after May 14, 1966.   The Court holds that the sale or exchange took place at the time of the fire; for in its view, it was the fire that transformed "tangible property into a chose in action consisting of a claim for insurance proceeds . . . ."   *Ante,* at 685.

I disagree.   That the fire gave the company a claim under its insurance policies does not mean that the involuntary conversion qualifying as a sale or exchange took place at that moment.   It is my view that such a claim does not ripen into a sale or exchange until it has attained a sufficiently definite quality and value to require the gain or loss to be accrued on the books of an accrual-basis taxpayer.   It is plain enough for me that no gain was accruable by Central Tablet until after May 14, 1966, and that the sale or exchange therefore took place after rather than before the adoption of the liquidation plan.

The general rule is that "[t]here shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."   26 U. S. C. § 165 (a).   Without doubt, had there not been insurance in this case, Central Tablet would have suffered a deductible loss from the fire and that deduction would have been taken in the year the fire occurred.   The ordinary rule also is, however, that deductible losses must be evidenced by closed and completed transactions and fixed by identifiable events.   *Boehm* v. *Commissioner,* 326 U. S. 287, 291 (1945).   In the context of an insured fire loss, where recovery of insurance is uncertain or unrealistic

the loss is to be taken in the year it occurs. *Coastal Terminals, Inc.* v. *Commissioner,* 25 T. C. 1053 (1956); *Cahn* v. *Commissioner,* 92 F. 2d 674 (CA9 1937). But if there is a fair prospect of recovering insurance proceeds, the loss is to be postponed until the question of recovery is sufficiently settled. *Commissioner* v. *Harwick,* 184 F. 2d 835 (CA5 1950); *Boston & M. R. Co.* v. *Commissioner,* 206 F. 2d 617 (CA1 1953); *Jeffrey* v. *Commissioner,* 12 T. C. M. 534 (1953).[1]

---

[1] Treas. Reg. §§ 1.165–1 (d)(1) and (2) provide:

"(d) *Year of deduction.* (1) A loss shall be allowed as a deduction under section 165 (a) only for the taxable year in which the loss is sustained. For this purpose, a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year. For provisions relating to situations where a loss attributable to a disaster will be treated as sustained in the taxable year immediately preceding the taxable year in which the disaster actually occurred, see section 165 (h) and § 1.165–11.

"(2)(i) If a casualty or other event occurs which may result in a loss and, in the year of such casualty or event, there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until it can be ascertained with reasonable certainty whether or not such reimbursement will be received. Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances. Whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim, by an adjudication of the claim, or by an abandonment of the claim. When a taxpayer claims that the taxable year in which a loss is sustained is fixed by his abandonment of the claim for reimbursement, he must be able to produce objective evidence of his having abandoned the claim, such as the execution of a release.

"(ii) If in the year of the casualty or other event a portion of the loss is not covered by a claim for reimbursement with respect to

694

Similar principles apply to determine when an accrual-basis taxpayer realizes income when an insured fire loss results in taxable gain. Under general principles of accrual accounting, two conditions must be met for income to be accrued in a given taxable year: the taxpayer must have a clear right to the income, and the quantum of the income must be ascertainable within reasonable limits. *United States* v. *Anderson,* 269 U. S. 422, 441 (1926); *Continental Tie & Lumber Co.* v. *United States,* 286 U. S. 290, 297 (1932); *Dixie Pine Co.* v. *Commissioner,* 320 U. S. 516, 519 (1944). "It has long been held that in order truly to reflect the income of a given year, all the events must occur in that year which fix the amount and the fact of the taxpayer's liability. . . ." *Ibid.* These

which there is a reasonable prospect of recovery, then such portion of the loss is sustained during the taxable year in which the casualty or other event occurs. For example, if property having an adjusted basis of $10,000 is completely destroyed by fire in 1961, and if the taxpayer's only claim for reimbursement consists of an insurance claim for $8,000 which is settled in 1962, the taxpayer sustains a loss of $2,000 in 1961. However, if the taxpayer's automobile is completely destroyed in 1961 as a result of the negligence of another person and there exists a reasonable prospect of recovery on a claim for the full value of the automobile against such person, the taxpayer does not sustain any loss until the taxable year in which the claim is adjudicated or otherwise settled. If the automobile had an adjusted basis of $5,000 and the taxpayer secures a judgment of $4,000 in 1962, $1,000 is deductible for the taxable year 1962. If in 1963 it becomes reasonably certain that only $3,500 can ever be collected on such judgment, $500 is deductible for the taxable year 1963.

"(iii) If the taxpayer deducted a loss in accordance with the provisions of this paragraph and in a subsequent taxable year receives reimbursement for such loss, he does not recompute the tax for the taxable year in which the deduction was taken but includes the amount of such reimbursement in his gross income for the taxable year in which received, subject to the provisions of section 111, relating to recovery of amounts previously deducted."

twin conditions have been formalized by Treas. Reg.
§ 1.451–1 (a), which provides in relevant part:

"Under an accrual method of accounting, income is
includable in gross income when all the events have
occurred which fix the right to receive such income
and the amount thereof can be determined with rea-
sonable accuracy. . . ."

These are the governing principles when the issue is
whether income from certain insurance policies covering
business or personal loss had accrued to the taxpayer.
Thus, where an insurance company does not admit liabil-
ity in the year of the loss, or takes a position in negotia-
tions which makes it quite uncertain whether the bulk of
the claim will be recoverable, accrual is improper.[2]

---

[2] *Maryland Shipbuilding & Drydock Co.* v. *United States*, 187 Ct.
Cl. 523, 409 F. 2d 1363 (1969) (accrual not required because extent
of liability contested by insurance company in negotiations not
completed in taxable year); *Cappel House Furnishing Co.* v. *United
States*, 244 F. 2d 525 (CA6 1957) (liability and approximate amount
determined in year of fire because of unreasonable delay of taxpayer in
presenting claim, and liability was both clear and could be approxi-
mated); *Georgia Carolina Chemical Co.* v. *Commissioner*, 3 T. C. M.
1213 (1944) (extent of liability not fixed in year of loss because of
uncertainty as to whether co-insurance clause, which would reduce
coverage, would be invoked by insurance company); *Luckenbach
S. S. Co.* v. *Commissioner*, 9 T. C. 662 (1947) (amount of recovery
on war risk insurance uncertain in years of loss because of contro-
versy between War Shipping Administration and Comptroller Gen-
eral); *Rit^-Way Products* v. *Commissioner*, 12 T. C. 475 (1949)
(extent and amount of liability of insurance company known in year
of loss); *Thalhimer Bros* v. *Commissioner*, 27 T. C. 733 (1957)
(where fire occurred six days prior to completion of tax year, insur-
ance proceeds did not accrue because extent of damage still uncer-
tain); *Curtis Electro Lighting* v. *Commissioner*, 60 T. C. 633 (1973)
(accrual not required because insurance company had never admitted
to liability in any amount in taxable year); *Kurtz* v. *Commissioner*,
8 B. T. A. 679 (1927) (accrual required where insurance company

Although it may generally be true that taxpayers seek to delay reporting income, this may not be so when there are large losses in the year of the conversion to absorb the insurance income. In that situation, the Commissioner may advocate that accrual in the year of the loss is improper. See *E. T. Slider, Inc.* v. *Commissioner,* 5 T. C. 263 (1945) (accrual improper in year of loss because collectibility of insurance proceeds doubtful). The principles of accrual accounting are designed to be neutral, so that the taxpayer may not time his gains and losses in inconsistent fashion to minimize his tax liability.

If normal accrual-accounting principles were to be applied in this case, it is clear that whatever the date on which income accrued to the corporation, it would not be the date of the fire, as the Court of Appeals held. At least some period of time, however short, must be allowed for the taxpayer to determine the extent of loss and to file a timely proof-of-loss form with the insurer. Cf. *Thalhimer Bros.* v. *Commissioner,* 27 T. C. 733 (1957). The question then becomes whether the amount should have accrued prior to or during the 12-month period beginning on May 14, 1966, the date on which the liquidation plan was adopted. This is largely a factual question, depending on whether liability was acknowledged, and whether the amount of liability was reasonably ascertainable before or after the adoption of the plan.

As to the issue of liability, there was some disagreement between the District Court and the Court of Appeals. The District Court found that "[a]t no time was an express admission of liability made by taxpayer's insurance adjusters. Indeed, there is some evidence in the record that the insurance companies denied that notice of claim was properly given." 339 F. Supp. 1134, 1139. The District Court further found that even if liability

---

had admitted liability and conceded bulk of loss claimed by taxpayer in year of loss).

had been admitted at some point, there was insufficient evidence in the record to determine at what point that admission occurred, even though that subject had been explored at trial. The Court of Appeals, on the other hand, believed that "the insurance carrier questioned neither the validity of the insurance contracts nor the fulfillment of the conditions for payment thereunder . . . ." 481 F. 2d 954, 956.

However, even accepting the view of the Court of Appeals that liability was not at issue, both courts found that the amount of liability was subject to dispute and negotiation. A number of issues divided the parties throughout the negotiations on the extent of coverage. Negotiations of Central Tablet's claim for business-interruption loss began on approximately October 8, 1965. Disputes subsequently arose over the estimated period of loss to be covered and the probable duration of the strike had there not been a fire, for the purpose of determining the "actual loss sustained." No settlement on this claim was negotiated until August 25, 1967, and, on or about September 22, 1967, petitioner received payment of $67,000, as compared with the maximum of $200,000 available under the two policies, which represented petitioner's initial request in the negotiations.

Negotiation of the building, machinery, and personal property loss claims began on approximately November 1, 1965. On the building insurance policies, dispute focused on a co-insurance clause.[3] The District Court

---

[3] This is formally termed a replacement-cost-endorsement co-insurance clause. The insurance adjuster explained at trial that a replacement-cost endorsement is bought by the insured to cover, in the event of compensable loss, the replacement cost of lost property. The co-insurance clause requires that the insured carry coverage up to a sufficient limit so that the premiums will justify the coverage. He additionally explained that, if the premiums are determined not to justify the actual replacement cost, coverage is reduced.

found that the questions over the applicability of the clause would reduce petitioner's coverage by 43% if the insurance companies prevailed. The parties also disagreed as to the extent of building loss and the value of the building at the time of the loss. Central Tablet accepted a settlement of its claim on approximately May 20, 1966, and, on June 15, 1966, received $174,595.05 in payment, as compared with the $225,000 stated maximum.

Finally, as to the personal property policy, dispute focused on the value of machinery and equipment and the cost of repair of repairable machinery and equipment. On approximately August 25, 1966, Central Tablet accepted a $104,609.27 settlement on this claim, as compared with the $450,000 stated maximum.

The District Court stated that these negotiations were "exceedingly complex and difficult," and "[i]n each case, substantial discrepancies existed between the initial offers made by the insurance companies, the maximum permissible coverage, and the amounts ultimately negotiated." 339 F. Supp., at 1139. Due to the factual record before it, the District Court concluded that the insurance proceeds did not accrue until after the plan had been adopted. The court stated that "it would be an utter fiction for us to conclude that the taxpayer realized fixed and estimable income before it adopted a plan of liquidation. . . ." *Ibid.* The Court of Appeals also recognized that there was a dispute over the amount to be paid under each policy. The factual findings of the District Court were consistent with the well-settled rule that accrual is only required when the quantum of income is ascertainable within reasonable limits. On the two insurance policies at issue here, the amounts received, $174,000 on the building policy and $104,000 on the personal property policy, compared with stated maximums of $225,000 and $450,000, respectively. These discrepancies bolster

the District Court's conclusion that there were substantial disagreements between the parties.

The general rule is that "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." 26 U. S. C. § 446. Central Tablet was an accrual-basis taxpayer, and it is clear that the amount of the insurance proceeds was not ascertainable with reasonable certainty until after May 14, 1966. No gain was accruable prior to that date, and the District Court was clearly right in holding that there had been no involuntary conversion and no sale or exchange prior to the adoption of the plan of liquidation. Absent the insurance policy, there could have been only a casualty loss, no "involuntary conversion" and no "sale or exchange." And with the various insurance policies owned by the taxpayer, the conversion into cash in an amount reasonably ascertainable did not become sufficiently predictable until after May 14, 1966.

To me, the Government's position in this case is anomalous. Although in arguing that the "sale or exchange" must be deemed to have occurred on the date of the fire, it was suggested by the Government in the Court of Appeals that if the issue were decided in favor of the Government, then a remand would be in order to determine in which year the gain was taxable. The Court of Appeals, whose judgment is now affirmed, followed this suggestion and remanded the case to the District Court. It is thus possible that the District Court, having already once concluded that the gain was not realized until the period of liquidation had begun in 1966, will reach the same conclusion on remand; but the gain under the Court's holding will nonetheless be taxable to the corporation. This seems a very odd result, for if insufficient events occurred in 1965 to warrant the accrual of gain by

an accrual-basis taxpayer, it is incongruous to hold that an involuntary conversion based on the collectibility of insurance proceeds nevertheless occurred at the time of the fire. In the context of the compensated fire loss, the time of realizing gain is the more realistic criterion of when the sale or exchange takes place within the meaning of § 337.

The statute does not tell us when an involuntary conversion qualifying as a sale or exchange must be deemed to have taken place. It provides sufficient flexibility so that in ordinary liquidations, sales or exchanges may be negotiated and all but completed by the corporation before the plan is adopted. It is contemplated that the corporate taxpayer may plan the liquidation and the timing of gains and losses from liquidating sales and exchanges. I perceive no reason why Congress would treat those whom accident forces to convert their property into cash any less favorably than those who have total control of whether a sale is to be made at all. If a compensated fire loss qualifies as a sale or exchange, as the Government concedes it does, it appears perfectly consistent with the terms as well as the purpose of § 337 to hold that the qualifying event occurs when the gain is realized and must be accrued. This would place those who are forced to liquidate on a par with those who chose to liquidate and to realize gains without paying the corporate tax.

The Commissioner argues, however, that there is an analogy between the treatment of condemnation "conversions" and losses by accidents. He would apply to compensated fire losses the uniform rule of the courts of appeals that a corporation is not entitled to the benefits of § 337 when property is condemned prior to the adoption of a liquidation plan. *Wendell* v. *Commissioner,* 326 F. 2d 600 (CA2 1964); *Dwight* v. *United States,* 328 F. 2d 973 (CA2 1964); *Covered Wagon, Inc.* v. *Commissioner,* 369 F. 2d 629 (CA8 1966); *Likins-Foster Honolulu Corp.*

v. *Commissioner,* 417 F. 2d 285 (CA10 1969). The rule in condemnation cases, however, is not directly at odds with accrual-accounting principles. Recognition of income is required at the time of a taking which transfers title to the property and creates an immediate obligation upon the condemning authority to pay just compensation. Rev. Rul. 59–108, 1959–1 Cum. Bull. 72. At the time the Government takes title to the property, it offers to pay a certain amount, thereby fixing its liability in a reasonably ascertainable amount. Under federal law, when the United States condemns property, it files its Declaration of Taking and deposits the amount of estimated compensation for the property in court. *Covered Wagon, Inc., supra,* at 634. The taking vests title in the Government, the condemnee is deprived of his property, and he is certain to recover at least the fair market value estimated by the Government.[4]

---

[4] The Commissioner also seeks to analogize this case to those dealing with computing of the holding period of lost or destroyed property in connection with measuring whether the gain from the sale of a capital asset is taxable as short-term or long-term capital gain or ordinary income. See *Rose* v. *United States,* 229 F. Supp. 298, 300 (SD Cal. 1964); *Steele* v. *United States,* 52–2 U. S. Tax Cas. ¶ 9451 (SD Fla. 1952). In *Rose,* which dealt with involuntary conversion in 1960, the holding period of the asset was found to terminate when the ship involved was lost at sea, rather than when insurance proceeds were received. The test for the dating of the end of the holding period is when the benefits or burdens of ownership are transferred or when title passes, whichever occurs first. See Comment, Extending Section 337 to Liquidations Triggered by the Involuntary Conversion of Corporate Assets, 62 Geo. L. J. 1203, 1213 n. 55 (1974). In *Rose,* when the ship was lost the owners totally abandoned it and gave all rights to salvage income to the insurer. Thus, all rights of ownership were relinquished at the time of the loss. The case does not relate to the timing of the receipt of income, as does the instant case, but only to the period of time a capital asset is held. The parties in *Rose* did not dispute that the gain, whether it

This is not the case here. The fire is an irrevocable event and except for the insurance, it would represent a loss immediately accruable. But with insurance coverage, there may be a gain, the amount of which may or may not be reasonably ascertainable, either then or within a short time; and until it is ascertainable, normal rules of accrual accounting would not require any gain to be recognized; and until that occurs the transaction has not sufficiently congealed to qualify as a sale or exchange.

I add a final note. The controlling Treasury Regulations under § 337 provide considerable flexibility to the parties in liquidation situations. Indeed, Treas. Reg. § 1.337–1 provides that "sales may be made *before* the adoption of the plan of liquidation if made on the same day such plan is adopted." (Emphasis added.) Thus, even under the Court's view that the sale or exchange occurs at the time of the fire, § 337 would be available to the property owner if it were sufficiently aware and took sufficient pains to plan in advance to comply with the Regulation or was a closely held corporation that could adopt its liquidation plan before the day of the fire was over. Other taxpayers not so inclined or so circumstanced to provide for contingencies would be foreclosed. Section 337 would remain a trap for the unwary, the precise situation Congress sought to avoid.

---

was short-term or long-term, as determined by the holding period, was to be recognized in 1960. This was largely because it appears that all relevant events occurred in that year; the loss, admission of liability, and settlement.

In *Steele*, there was also no dispute as to the timing of recognition. The taxpayer, reporting on a cash basis, received insurance in 1944 for the loss which occurred in 1943. The Commissioner asserted a deficiency for *1944*. Even though the court held that there was not a 6-month holding period, so that the gain was ordinary income, it was still incurred in 1944, the date of the receipt of insurance proceeds, and not in 1943, the date of the loss of the vessel.