**MARSHALL FOODS, INC.,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

No. 2–72 Civ. 334.

United States District Court,
D. Minnesota,
Second Division.

Dec. 2, 1974.

Hayner N. Larson, Erwin M. Goldstein, Minneapolis, Minn., for plaintiff.

Robt. G. Renner, U. S. Atty., by Stephen Palmer, Asst. U. S. Atty., Minneapolis Minn., for defendant.

## ORDER

MILES W. LORD, District Judge.

This income tax refund case, submitted to the Court on stipulated facts and briefs, requires the determination of whether certain proceeds of insurance policies paid to the plaintiff should be taxed as ordinary income or as capital gains. The plaintiff, during its tax years 1966 and 1967, was engaged in the manufacture and sale of powdered eggs. For this purpose, plaintiff operated an egg drying plant, its main plant, and a feed plant, known as the Kelco plant. The insurance policies in question provided benefits to the plaintiff if and when his business was interrupted by certain hazards, including fire. In the event of a total interruption of business,

the policy provided for a daily payment of $4,000 and in the event of a partial interruption, the benefits would be proportional to the amount of output curtailed. There was to be a $5,000 deductible on any benefits paid.

On February 17, 1966 and again on September 21, 1966, plaintiff's main plant was damaged by fire. As a result, payments under these insurance policies amounting to a total of over $1.1 million were made to the plaintiff. Of this amount, $168,000 accrued during the taxable year ending March 31, 1966, and the balance accrued in the following year.

In filing its return for these years, plaintiff treated the amounts accrued as capital gains. Subsequently, deficiencies in tax were determined for both years. The portion of the deficiencies attributable to the income at issue amounted to $79,414.82 in the 1966 tax year, and $221,181.54 in the 1967 tax year. The deficiencies were noted because, in the IRS's view, the amounts paid to the plaintiff by reason of the total and partial suspension of business should have been taxed as ordinary income, rather than as long-term capital gain.

The deficiencies and accrued interest were paid and plaintiff filed claims for the deficiency and interest so paid. More than six months have passed since the filing of the claims for refund and no response has been made by the defendant. This Court, therefore, has jurisdiction to hear the matter pursuant to 28 U.S.C. § 1346(a)(1).

The parties agreed to submit the case on stipulated facts and briefs, and have done so to such an extent that there is but one issue remaining for determination. Plaintiff contends that the legal issue of whether the payments were a substitute for lost income, or compensation for the loss of use of the assets should be resolved in favor of compensation. Defendants argue that it should be resolved as a substitute for income and, alternatively, that it doesn't make any difference how the Court resolves it since, in either case, the insurance payments should be treated as ordinary income as opposed to long-term capital gains.

This Court is of the opinion that the issue should be resolved in favor of the defendant, in favor of the proposition that the payments in question were a substitute for lost income and should therefore be taxed as ordinary income.

■ It is a fundamental principle of tax law that the taxable status to the recipient of daily indemnity monies is identical to that of the monies that they are intended to replace. Maryland Shipbuilding and Drydock Co. v. United States, 409 F.2d 1363, 1365, 187 Ct.Cl. 523 (1969); Miller v. Hocking Glass Co., 80 F.2d 436 (6th Cir. 1935), cert. denied 298 U.S. 659, 56 S.Ct. 681, 80 L. Ed. 1384 (1936).

The case of Commissioner of Internal Revenue v. Gillette Motor Co., 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1959), sets out the general principles on the characterization of income that results from an involuntary conversion of capital assets that consist of real or depreciable personal property used in a trade or business. In that case, the Court noted that there are two valuable property rights that can be compensated for after an involuntary conversion: the investment in the physical assets themselves and the right to determine the use to which the physical assets are to be put. The former property right when converted is taxed as a § 1231 capital gain, while the latter when converted is § 61(a) ordinary income. *Id.* at 135–36, 80 S.Ct. 1497.

The plaintiff in his memorandum concedes this point and agrees that the proceeds from a "business interruption" policy or a "use and occupancy" policy

can and do give rise to ordinary income liability when it in fact compensates for loss of profits, rents, earnings, etc. Citing Massillon-Cleveland-Akron Sign Co., 15 T.C. 79 (1950); Williams Furniture Corporation, 45 B.T.A. 928 (1941); Flaxlinum Insulating Co., 5 B.T.A. 676 (1926); and Piedmont-Mt. Airy Guano Co., 3 B.T.A . 1009 (1926).

▮ The particular facts in this case lead this Court to the conclusion that insurance benefits received by plaintiff were to compensate him for the loss of earnings and profits.

(1) The stipulated facts reflect that in addition to the insurance policies now under discussion, plaintiff had contracts of insurance providing for payment of the amount of monetary loss sustained by reason of direct damage to the physical properties of the plaintiff's plants. Therefore, the use and occupancy insurance indemnity could not be for the loss of investment in the physical assets themselves.

(2) The insuring clause notes that the condition precedent to coverage is not just destruction or damage but destruction or damage "so as to necessitate a total (or partial) suspension of business. Therefore, the situation could arise wherein there could be total suspension with destruction of a $1.00 piece of equipment that would call for the total *per diem* benefit or wherein there could be destruction of an expensive piece of equipment with no suspension of operation which would not necessitate the payment of any *per diem* benefit. It is clear that suspension of business, not destruction of the asset, is the triggering event. (*See* (1) *supra.*)

(3) In the deposition of Stanley Carlson, an individual who was involved in the procurement of the insurance in question, the issue of the *per diem* coverage on the Paynesville plant was raised. The Paynesville plant supplied material to the Marshall plant. It was noted that if there was a decrease in the volume of business at the Marshall plant due to a hazard covered by the policy, fire for example, that caused a decrease in the volume of the Paynesville plant, the policy in question was to be extended to cover the actual loss sustained at the Paynesville location. The only loss that could be meant there is loss of earnings from the failure to have a market for 20% of their production that had to go to the Marshall plant. *See,* Defendant Deposition Exhibit 25.

(4) The correspondence between the plaintiff and the insurance agency that was attempting to place the business interruption insurance in question reflects the need for justification for the amount of indemnity requested. In response to that inquiry the plaintiff forwarded information based totally on gross earnings. The insurance was written on that information alone. The business interruption worksheet is of particular interest. From that it is obvious that what is being compensated for is the loss of part of the "profits" [1] of the business. The *per diem* figure of $4,000 was arrived at by assuming future annual gross earnings of $1,500,000, minus estimated annual payroll costs of $300,000 divided by 300 annual working days.

(5) In the deposition of Charles S. Benson, one of plaintiff's representatives in the securing of the insurance policies which are the subject of this litigation, it becomes apparent that with respect to the business interruption worksheet that was requested by the insurer, the actual loss sustained figures

---

1. Profit here is used in the largest sense as the gain made by the sale of produce or manufactures, after deducting the value of the largest single expense item—labor.

were to be equated with the loss of net profits (Benson depo. at 4). He admitted that the indemnity was dependent on gross earnings divided by number of work days. Later on in the deposition, Mr. Benson admitted that, with respect to partial suspension of operation, the indemnity was to be based on actual dollars of production divided by base period dollars of production times four thousand dollars ($4,000).

The previously enumerated facts point out how the insurance indemnity payments cannot represent a reimbursement for the loss of the property itself and seem to be calculated on lost earnings. Defendant's argument that these indemnity insurance payments should be taxed as capital gains therefore must be on the theory that they represent payments to offset costs that are incurred when the plant is not in operation.

■ If the payments do represent payment for costs, they still do not qualify for capital gains treatment. The special tax treatment provided by Subchapter P applies only to gain or loss realized on the sale or exchange [2] of capital assets as defined in § 1221, and to gain or loss which, under special statutory provisions, is "considered as" gain or loss from the sale of capital assets.

There is no capital asset involved here. In the normal course of business, the earnings of the corporation would be diminished by the payment of not only employees' salaries but also rent, depre-ciation, advertising, etc. Here the insurance indemnity will take the place of those earnings, to be a source for these payments, to provide the corporation with its "profit." They are the same as accounts or notes receivable that are specifically excluded from the definition of a capital asset § 1221(4).

The Supreme Court has suggested that the preferential treatment of capital gains tax is intended not only to relieve the tax payer of the excessive tax burden on gains resulting from what may well be appreciation over a number of years in capital investments, but also to permit economic mobility. The Court has also concluded that since the section is an exception to the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. Corn Prod. Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955). Giving "earnings" capital gains treatment not only negates legislative intent for Subchapter P but also undermines the legislative intent for § 61.

For these reasons, the proceeds from the insurance policies in question should have been taxed as ordinary income under § 61(a). Therefore the deficiencies assessed were correct and plaintiff's claim for the deficiency and interest is denied.

It is so ordered.

---

2. Since there is no capital asset involved in this case the Court need not decide whether the involuntary conversion in this case fits within the statutory definition of "sale or exchange." Nor does the Court need to rule on the question of the statutory holding period.