**MARYLAND SHIPBUILDING AND DRYDOCK COMPANY**

v.

**The UNITED STATES.**

No. 350–64.

United States Court of Claims.
April 11, 1969.

Numa L. Smith, Jr., Washington, D. C., attorney of record, for plaintiff. David R. Owen, Baltimore, Md., Clarence T. Kipps, Jr., Miller & Chevalier, Washington, D. C., and George D. Hubbard, Semmes, Bowen & Semmes, Baltimore, Md., of counsel.

Edna G. Parker, Washington, D. C., with whom was Asst. Atty., Gen., Johnnie M. Walters, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner George Willi with directions to make findings of fact and recommendation for conclusion of law under the order

of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on November 26, 1968. Exceptions to the commissioner's opinion were filed by the parties on January 9, 1969; however, on February 17, 1969, the parties filed a stipulation wherein they withdrew their respective notices of intention to except to the commissioner's opinion and report and further stipulated that the court may adopt the opinion, findings of fact and recommended conclusion of law contained in the commissioner's said report and enter judgment based thereon. Further, plaintiff has agreed that it will withdraw or take no further action on its protective alternative refund claims, Form 843, for the years 1958 and 1961, which were filed with the District Director of Internal Revenue, Baltimore, Maryland, on or about March 12, 1965. Since the court agrees with the commissioner's opinion, findings, and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 47(c).

## OPINION OF COMMISSIONER

WILLI, Commissioner:

This tax refund suit for 1960 presents two issues, both concerned with the tax treatment to be accorded certain insurance proceeds that the plaintiff received on account of an accident that occurred in its Baltimore shipyard. The factual details surrounding this occurrence and its aftermath are set forth at length in the findings of fact accompanying this opinion. Only those facts central to the decision reached will be restated here.

Plaintiff, an accrual-basis taxpayer, operates a shipbuilding and ship repair business that utilizes piers, buildings, cranes, and four floating drydocks.

On October 28, 1960, through the negligence of plaintiff's employees, a merchant ship developed a serious list while being berthed in drydock #1. Before the vessel could be righted it suffered extensive damage and, in addition, damaged drydock #1 to the extent that it sank. Lesser damage to another drydock, adjacent piers, and other structures and equipment, also resulted.

On the date of the accident Maryland had two sets of insurance policies in effect, Shiprepairers Liability policies, (hereafter referred to as "SRL" policies) and Hull policies, issued by Lloyd's of London and by the Institute of London Underwriters. There was a Hull policy issued by Lloyd's and a Hull policy issued by the Institute; there were two SRL policies issued by Lloyd's (one primary coverage and one excess coverage) and two SRL policies issued by the Institute. The total SRL coverage here was $8,000,-000 ($2,000,000 primary coverage and $6,000,000 excess). The Lloyd's syndicates, the companies, and the percentage of risk underwritten by each were the same on the Hull policies as on the SRL policies; the risk apportionment being approximately 70 percent with Lloyd's and 30 percent with the companies.

The Hull policies contained a Section C, entitled "DOCKS—LOSS OF EARNINGS" which provided as follows:

If in consequence of an accident or occurrence which would be covered under SECTION B of this Policy [SECTION B—DOCKS] * * * the Dry Docks are prevented from operating, this Section is to indemnify the Assured for a complete stoppage $5,000 per day, or proportionately for a partial stoppage, in excess of the first Five (5) days, for the period any Dry Dock is so prevented from operating but for not exceeding Sixty (60) days (irrespective of the expiry date of this insurance) in respect of any one accident or occurrence.

It is hereby agreed that the sum of $300,000 (THREE HUNDRED THOUSAND UNITED STATES DOLLARS) is agreed by the Underwriters and the Assured as correctly representing the Loss of Earnings in respect of each Dry Dock which the Assured would

sustain if they were entirely prevented from operating any one of the said Dry Docks during a period of Sixty (60) days.

As will be seen, the accident permanently disabled drydock #1. Accordingly, plaintiff received the $300,000 referred to in the policy language quoted above. For federal tax purposes, it declared this sum on its 1960 return as gain resulting from an involuntary conversion under Section 1231 of the Internal Revenue Code of 1954. The Commissioner of Internal Revenue disallowed this treatment, contending that the $300,000 was taxable as ordinary income to plaintiff. Unreconciled disagreement as to this item represents one of the two issues presented for decision.

It is undisputed that the insurance money that plaintiff received for the property loss of drydock #1, as later discussed constituted involuntary conversion proceeds. In contending for similar treatment as to the $300,000, plaintiff urges that this was simply compensation for loss of the right to use the dock in its business—an appurtenant and inseparable attribute of outright ownership of the dock. Whatever the conceptual appeal of such an approach to the problem as an original proposition,[1] the argument is foreclosed by the express language of the policy. After specifying $5,000 as the indemnity payment for each day of total downtime experienced by plaintiff, up to a 60-day maximum, the policy goes on to recite precisely what plaintiff and the insurer have agreed that the payments are to represent. The payments are characterized "* * * as correctly representing the *Loss of Earnings* in respect of each Dry Dock which the Assured would sustain if they were entirely prevented from operating any one of the said Dry Docks * * *." (Emphasis added.) No reason is offered, and none is apparent, for rejecting the parties' explicit contractual understanding as to the nature and purpose of the daily indemnity monies. The fundamental principle

that the taxable status of such monies to the recipient is identical to that of the profits that they are intended to replace is long-established and generally unquestioned. Miller v. Hocking Glass Co., 80 F.2d 436, 437 (6th Cir. 1935), cert. denied, 298 U.S. 659, 56 S.Ct. 681, 80 L.Ed. 1384 (1936); Marcal Pulp & Paper, Inc. v. Commissioner of Internal Revenue, 30 T.C. 1345, 1350 (1958), aff'd per curiam, 268 F.2d 739 (3d Cir. 1959), cert. denied, 361 U.S. 924, 80 S.Ct. 294, 4 L.Ed.2d 240 (1959); Oppenheim's, Inc. v. Kavanagh, 90 F.Supp. 107, 111–112 (E.D.Mich. 1950); Massillon-Cleveland-Akron Sign Co. v. Commissioner of Internal Revenue, 15 T.C. 79, 84–85 (1950). *See also* Sec. 1.1033(a)–2(8), Treasury Regulations under the 1954 Code.

Each of the three decisions on which plaintiff relies for its involuntary conversion contentions expressly approves the authorities set forth above and pointedly distinguishes them factually. The holdings in Williams Furniture Corp. v. Commissioner of Internal Revenue, 45 B.T.A. 928, 937 (1941), acq., 1942–1 Cum. Bull. 17; Shakertown Corp. v. Commissioner, 277 F.2d 625, 628 (6th Cir. 1960); and Darlington Veneer Co. v. Commissioner, P–H Tax Ct.Mem. 124, ¶ 42,056 (1942), were expressly predicated on the fact that, unlike the coverage here involved, the policies provided for a flat daily indemnity payment basically unrelated in amount to profits or the loss thereof.

In May of 1961, plaintiff received a lump-sum payment of $3,000,000 from the underwriters in final settlement of its rights under the property damage coverage on drydock #1 pertaining to the October 1960 accident. Plaintiff declared the gain resulting from this involuntary conversion on its 1961 return, and the Internal Revenue Service took the position that the entire payment had accrued to plaintiff for federal tax purposes in 1960 and was therefore reportable in that year. A deficiency was assessed and issue was thus joined on the remaining is-

---

1. *Cf.* Hort v. Commissioner, 313 U.S. 28, 31–32, 61 S.Ct. 757, 85 L.Ed. 1168 (1941).

sue in this case, *i. e.,* whether any part [2] of the $3,000,000 payment was properly accruable in 1960.

■■ As is usual where the question is that of accrual, the dispute here turns on the application, not the selection of controlling legal principles. With an accrual-basis taxpayer such as plaintiff, it is crystallization of the right to receive income, not prior expectation[3] nor subsequent receipt, that determines the year in which the income must be declared for federal tax purposes. Spring City Foundry Co. v. Commissioner of Internal Revenue, 292 U.S. 182, 184–185, 54 S.Ct. 644, 78 L.Ed. 1200 (1934). As this court observed in Breeze Corporation, Inc. v. United States, 117 F.Supp. 404, 407, 127 Ct.Cl. 261 (1954), "* * * before an item of income may be accrued, there must be a fixed, determined and enforceable right to receive a reasonably ascertainable amount."

The Government contends that by the end of 1960, $1,500,000 of the $3,000,000 received in May of the following year met the test for tax accrual because of the interaction of then-known facts and plaintiff's rights under its valued insurance policies—the Hull policies.

Plaintiff's property damage exposure was covered under both its SRL and Hull policies.

As previously noted, the SRL property damage coverage was $8,000,000; $2,000,000 primary coverage and $6,000,000 excess. The insured value of drydock #1 under the Hull policies was $1,500,000.

In the event of a casualty such as occurred here, the insured had two types of claim options under the Hull policies. Upon a satisfactory showing that the cost of raising and repairing the drydock would exceed its insured value of $1,500,-000, the insured could claim a constructive total loss and, after filing a timely notice of abandonment of the damaged property to the underwriters, collect $1,-500,000. The insured's other alternative under this coverage was to claim reimbursement, up to a maximum of $1,500,-000, for the cost actually incurred in raising and repairing the drydock.

In addition to the described coverage respecting property damage to the drydock itself, the particular Hull policies here involved contained a provision unique to this type coverage—a third-party liability feature embodied in a so-called Protection and Indemnity [P&I] clause. See finding 7, *infra.* Whether, in the event that a $1,500,000 constructive total loss had been claimed and allowed, the coverage afforded by the P&I clause would have reimbursed plaintiff for the cost of removing the drydock wreckage from its premises was never determined. Though there was not unanimity, either way, on the question among the underwriters, plaintiff always assumed that a clause dealing with liability to third parties would not cover removal costs of wreckage located on the insured's own property.

SRL policies of the type held by plaintiff conventionally cover the insured's liability to third parties for the cost of repairing damages to their property. These particular policies, however, contained a clause[4] extending the coverage to the repair of damages sustained by the insured's own property and caused by vessels or other craft under construction or repair in the insured's yard. This was the provision on which plaintiff relied for the recovery, albeit a cash recovery for unrepaired damages, that it sought and ultimately obtained from the underwriters.

---

2. As this litigation has progressed defendant has receded from its initial position that the entire $3,000,000 was accruable in 1960. On brief it contends for 1960 accrual of $1,500,000, conceding that plaintiff's treatment was proper as to the remaining $1,500,000.

3. A taxpayer is no more required to be an incorrigible optimist as to accrual of an income item than he is when the item is one of deduction. United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 403, 47 S.Ct. 598, 71 L.Ed. 1120 (1927).

4. Finding 8, *infra.*

Finally, these particular SRL policies included still another clause that was generally alien to such coverage. It provided:

This insurance is in no event to be liable for any loss, damage and/or expense to the vessel or vessels or property which may be recovered under any other insurance *except as to any excess over and above such amounts recovered* in respect of any claim for which this insurance would otherwise have been liable, and excepting the liability of the Assured under rights subrogated to such other insurers. (Emphasis added.)

This clause in the SRL policies, coupled with the factual aspects of liability and damage questions developed early in the accident investigation, is the mainspring of the Government's contention that as of December 31, 1960, plaintiff had to accrue $1,500,000 of its $3,000,000 1961 insurance recovery. *Simpliciter*, the argument is that the quoted language denominates the unvalued SRL coverage as excess to that of the valued Hull policies; that the insured was therefore compelled to first exhaust its recovery rights under the Hull policies; and that on the facts extant as of December 31, 1960, there is no question but that the underwriters would have declared drydock #1 a constructive total loss under the Hull policies and paid plaintiff the valued sum of $1,-500,000.

The Government's theory of 1960 accrual is invalidated both by the fallacy of its construction of the policy language and, more importantly, by its omission of one decisive factual consideration.

It is plain from the quoted policy language, and especially the underscored portion of it, that the SRL clause relied on by the Government is nothing more than an anti-windfall device. As such, it simply gives contractual recognition to the statutory prohibition in British law against double insurance recoveries for the same loss. Marine Insurance Act, 1906, 6 Edw. 7, Ch. 41, Sec. 32(2) (c),

(finding 9, *infra*). Contrary to the Government's assertion, the clause does not tell the insured that he must first proceed under any outstanding valued coverage; only, that in claiming under the SRL coverage, he must give effect to any amounts that he has already recovered under valued policies in respect to the same loss. This, coupled with the fact that plaintiff never asserted a claim under its Hull policies because of the limited cash-recovery possibilities offered by them, relegates the Government's policy language argument to the status of an inaccurate abstraction.

The factual flaw in the Government's theory of mandatory 1960 accrual of potential though unclaimed Hull policy proceeds, lies in the erroneous assumption that, without more, the case for such accrual is established once it is found, as it is herein,[5] that within the year 1960 the insurers would have accepted plaintiff's claim for a constructive total loss and paid it $1,500,000. The theory fails because it is equally clear from the record, essentially undisputed by the Government, and so found,[6] that within 1960 the insurers would only have unequivocally agreed to pay the valued sum of $1,500,-000 if plaintiff had reciprocally agreed, generally, to accept that amount in total settlement of its drydock property damage claim and, specifically, to forego the right to assert any further claim in respect thereto under the SRL policies. The attachment of such a condition to a willingness to pay prevents the recipient's accrual of the amount involved.

When the cases speak of "a fixed right to receive" an amount as the touchstone of its accruability for federal tax purposes, they plainly comprehend a "right" that is enforceable with no strings attached—not a "right" the exercise of which must be purchased by the beneficiary with the surrender of some other related and valuable right such as, in this case, the right to pursue the possibilities for an additional recovery under the SRL policies.

5. Findings 17, 19, 33, 34, 52, *infra*.

6. Findings 35 and 52, *infra*.

The applicable principle is well-illustrated by the decision in American Hotels Corp. v. Commissioner of Internal Revenue, 134 F.2d 817 (2d Cir. 1943). There the taxpayer operated a hotel for a life insurance company under a management contract. It was discovered that the taxpayer's resident manager misappropriated $42,000 for which he could not make current restitution. The insurance company called on the taxpayer to make good the loss. Because maintenance of the insurance company's goodwill was vital, the taxpayer was prepared to do whatever was necessary to resolve the matter in a manner satisfactory to its landlord. It kept this decision to itself, however, and in December 1937, offered the insurance company $4,200 (10 percent of the loss) in full settlement of the entire matter. This offer was rejected and in April 1938, the parties concluded a settlement for $25,000. The taxpayer claimed a $25,000 deduction on its 1937 return which the Commissioner of Internal Revenue disallowed on the ground that the expense had not been incurred in that year. The Tax Court upheld the Commissioner's view. In affirming, the Second Circuit said (134 F.2d at 819):

> * * * when, as here, the taxpayer keeps its books on an accrual basis, such a deduction can be taken only for the taxable year in which the expense was "incurred." That means that there must be some reasonably clear definitization, within that year, of the amount of the expenses. Whether or not there was, depends upon the peculiar facts of each particular case. We think that here there was substantial evidence to sustain the finding of the Tax Court that there was no such definitization in the taxable year 1937.

> In that year the taxpayer offered to pay $4,200. *Had it then said unconditionally that it would pay that sum, leaving open for further negotiations any greater liability, perhaps it could have deducted $4,200 for 1937. But that it did not do; it offered that amount only on condition that it be*

*released in full.* The amount claimed by Metropolitan was $42,000, and the taxpayer, although it' did not so advise Metropolitan, was then prepared to go even beyond that limit; but taxpayer, in 1937, did not know how far it would go; it was ready to pay anything from $4,200 up to an undetermined maximum. In fact, in 1938, it agreed to pay $25,000. But, *as there was no expression in 1937 of a willingness unconditionally to pay any definite amount, we cannot say that the Tax Court was not justified in finding that no expense was then incurred.* (Emphasis added.)

█ The status of the taxpayer's 1937 settlement offer of $4,200 in *American Hotels, supra,* is precisely analogous to that of the $1,500,000 Hull policy proceeds throughout 1960 in the instant case. The bare fact that plaintiff could have had those proceeds, or an ironclad promise for them, in 1960 does not furnish a basis for accrual any more than it did as to the $4,200 tendered in *American Hotels.*

The uncontradicted evidence in this case shows that in late December 1960, the plaintiff, through its London insurance broker, unsuccessfully attempted to secure an unconditional agreement from the insurers to adjust the drydock loss under the SRL policies, first giving effect to the $1,500,000 valued coverage of the Hull policies. The insurers specifically refused to agree to "pay" under this adjustment format, being willing only to say that they would "consider" such an approach. (Finding 32, *infra*). This express equivocation by the insurers conclusively deprives the Hull policy proceeds of the fixed and autonomous status essential to accrual. In short, even though all facts known in 1960 pointed to the likelihood that plaintiff would eventually recover the amount of the Hull proceeds for its drydock loss, accrual at that time would have been premature because the insurer-obligors refused in good faith to denominate the amount of such proceeds as a floor figure within the context of the claim at large.

Luckenbach Steamship Co., 9 T.C. 662 (1947), demonstrates the degree of

definiteness that is prerequisite to the tax accrual of an item of potential receipt. The accrual issue concerned the tax treatment to be accorded indemnity payments ultimately made to the owners of ships lost at sea while under charter to the War Shipping Administration. The full Tax Court stated (at 674) that even a tender of partial payment to the owners with the unqualified right in them to file suit for just compensation as to the balance of their claims did not constitute " * * * an unconditional offer of payment upon which an accrual of income could be based."

In the particular area of accrual of insurance proceeds it has been held that the amount thereof, even after the amount of the loss has been fully adjusted, is not accruable at all until the insurer has formally waived co-insurance requirements that applied to only a part of the property items comprising the loss. Georgia Carolina Chemical Co., 3 Tax.Ct. Mem. 1213, 1216 (1944).

■■ An example of insurance proceeds meeting the criteria for accrual in a taxable period prior to that of receipt is found in Max Kurtz, et al., 8 B.T.A. 679, 684 (1927), where the Board found a prompt admission of liability by the insurer coupled with an unqualified concession as to the bulk of the loss claimed by the insured to be sufficient to sustain an accrual in the earlier period. Such a situation is far removed from that at hand where, during 1960, the insurers studiously avoided making any firm commitment as to either overall policy coverage or total amount of the loss. An unqualified recognition of liability by the obligor is the essence of accrual by the prospective recipient. 2 Mertens, Law of Federal Income Taxation Sec. 12.61 (1967 Rev.). An insurer's tacit recognition of the fact and general extent of damage suffered by its insured, which is all that occurred here in 1960, does not meet or displace this central requirement of admission of liability.

The insurers' equivocal stance respecting liability throughout 1960 assumes controlling significance for accrual purposes when coupled with the fact that there is no suggestion in the record that plaintiff acted in any way to forestall agreement as to the basic principles of liability and damage on which a settlement could be founded. In short, there is no indication that for tax or other extrameritorious reasons plaintiff attempted to influence or manipulate the timing of a settlement agreement. Cf. E. Morris Cox, 43 T.C. 448, 457, n. 3 (1965). The bar to earlier agreement was simply plaintiff's persistence in asserting recovery rights under the higher-limit SRL policies—an approach that it initially adopted for sound business reasons [7] and under which it finally prevailed in 1961.

In summary, the business interruption proceeds received by plaintiff are taxable as ordinary income and no part of the property damage proceeds received in 1961 is taxable to plaintiff in 1960.

---

**7.** Findings 25, 26 and 27, *infra.*