**FLAMINGO RESORT, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. LV 76–19 RDF.**

United States District Court, D. Nevada.

Feb. 26, 1980.

Lionel, Sawyer & Collins by Stephen L. Morris, Las Vegas, Nev. and Levenfeld, Kanter, Baskes & Lippitz by Milton A. Levenfeld, Donald A. Statland, Steven A. Felsenthal, Chicago, Ill, for plaintiff.

B. Mahlon Brown III, U. S. Atty., Las Vegas, Nev. by James Crowe, Trial Atty., Tax Division, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### THE FACTS

ROGER D. FOLEY, Chief Judge.

Flamingo Resort, Inc. (Flamingo), was incorporated on August 17, 1967, and at all times relevant to this case was the owner and operator of a gaming resort in Las Vegas, Nevada. The Flamingo kept its books and reported its taxes on the accrual basis of accounting.

Flamingo filed an income tax return for the short taxable year ended December 31, 1967. The return showed a taxable income of $22,500 and, because of certain tax credits, no tax liability. Following an audit and other administrative proceedings, the Commissioner of Internal Revenue asserted a proposed deficiency in the amount of $265,-034.34. Of that amount, Flamingo agreed that $3,091.69 was properly due as the result of adjustments that raised taxable income to $31,075. Flamingo continued to object to the inclusion in income of $545,711 represented by "casino receivables." While the total "casino receivables" on the books of Flamingo amounted to $676,432, the Commissioner allowed a loss deduction of $130,721 for uncollectible accounts. The Flamingo, however, paid the entire amount of the asserted deficiency, plus interest, on December 22, 1975. Then the Flamingo filed a claim for refund of an overpayment in the amount of $261,942.65, plus interest. When the claim was denied by the Internal Revenue Service, the Flamingo timely commenced this action to recover the alleged overpayment.

From August through December 1967, the taxable period in question, Flamingo operated crap games, twenty-one games and roulette wheels in the casino portion of its business. Patrons generally gambled chips at these games. Under normal circumstances, a patron would obtain chips either through the exchange of cash or a marker, which was essentially a countercheck signed by the patron in the amount of the chips transferred to him. This exchange would take place either in the "pit" area, where the games were being conducted, or at the casino cage, where chips would be exchanged by the casino for cash or counterchecks. Before credit would be extended to a patron, Flamingo conducted extensive credit checks and then established a line of credit allowable to that patron. Extensions of credit during the course of play were subject to controls by Flamingo personnel and were recorded in the pit area and reconciled at the cashier's cage. It is estimated that sixty percent of the total play in the casino resulted from extensions of credit and, as a result, such extensions are absolutely essential to the success of the Flamingo's business.

A patron was expected to settle his liability shortly after concluding his play, and the vast majority of credit extensions were satisfied on that basis. If a patron had not satisfied his marker liability by the close of his stay at the hotel, the marker became classified as a casino receivable. Extensive collection activities were undertaken with respect to these receivables and actual payment was received on the vast majority of them. The record indicates that the Flamingo's estimates of collectibility on outstanding casino receivables ranged as high as 96 percent.

In the Flamingo operation during the period in question, the marker was in the form of a countercheck with blanks left for the name of the bank and account number. In practice, the patron only signed his name after the amount had been entered without completing the blanks for bank informa-

tion. The necessary information was available, however, on the credit application kept in the casino credit office. It was thus possible for the Flamingo to complete the counterchecks and submit them for payment to the makers' banks.

Casino receivables, including markers, checks given in payment for the markers that were returned for insufficient funds, and checks given in payment for the markers that were post-dated beyond the close of the taxable period on December 31, 1967, net of a reserve for potential uncollectibility, were included on the Flamingo's financial statement as revenue and as assets.

In virtually all cases, a patron would receive chips in exchange for his marker or countercheck. But the patron could gamble both with chips and, to a limited degree, with cash. Any winnings would, however, be paid to the patron in chips. The inventory for each game at the casino consisted of chips. As the games progressed, additional chips would be transferred to the games from the cage to "fill" the inventory. The casino's net gambling revenue at a game for a given eight-hour shift would constitute the difference between the total volume of play at the table, which is called the "drop" (consisting of cash, markers and foreign chips), and the total "fill" at the table (opening chip inventory plus "fill," less closing inventory). For the short taxable period in issue, the Flamingo showed a "gross games revenue," drop minus fill, of $3,967,-600 on a total play of $20,102,429. The Flamingo also accounted for and controlled calculation of its gaming revenue by reflecting adjustments in its "bankroll." This is essentially the book inventory maintained in the cage and, at the beginning of an accounting period, will consist of cash, chips, unpaid markers and chips from other casinos, foreign chips that were played in the Flamingo casino. The changing composition and amount of the bankroll gauges the casino's wins and losses, but the play of chips by gambling patrons is the activity that determines these amounts.

Chips in the patrons' hands represented outstanding obligations which the Flamingo always recognized. Once a patron obtained chips, he could expend them through gambling or by purchasing hotel, restaurant and bar services at either the Flamingo's business establishment or at other casinos in Las Vegas. In 1967 the casinos conducted a regular exchange of their chips at face value and, in addition, cash payments would be made, as necessary, to equalize the exchange.

In accordance with generally accepted accounting principles, the Flamingo prepared its financial statements on the basis of the accrual method of accounting. The amount of "casino receivables," less a reserve for doubtful accounts, was included in income. For tax purposes, however, Flamingo reduced its gross gaming receipts by excluding the face amount of the markers outstanding. The Flamingo argues that these are unenforceable gambling debts and are therefore not properly accruable as taxable income. The Government had not contested the Flamingo's claim that the markers may be legally unenforceable, but urges that the markers nevertheless represent income that is properly accruable for purposes of determining taxable income. Moreover, the Government contends that such accrual is mandated by the requirement that a taxpayer's method of accounting "clearly reflect income." Exclusion of the markers, argues the Government, allows Flamingo to distort income by postponing recognition of this income which results in a mismatching of income and expenses related thereto.

The Flamingo has moved for summary judgment with respect to that portion of the claim that relates exclusively to "pit markers." The motion seeks determination of the question of liability only, with the amount subject to subsequent determination. The Government has moved for summary judgment in its favor with respect to the entire controversy. If there are any genuine issues of material fact, they concern only the question of a "gambling purpose" with respect to the possible existence of cage markers and checks included in the "casino receivables" account. That issue would be relevant only if it were deter-

mined that legal enforceability is necessary for the accrual of the income in question.

I. *Jurisdiction*

This Court has jurisdiction, 28 U.S.C. § 1346(a)(1).

II. *Gambling Debts Under Nevada Law*

■ This entire controversy arises only because of an apparent quirk of Nevada law. Despite the licensing and taxing of gaming by the State of Nevada and the state's economic dependence upon gambling, the Nevada courts have consistently refused to recognize any legally enforceable rights arising out of a gambling transaction short of the actual transfer of money.[1] The Supreme Court of the State of Nevada early held that the statute of 9 Anne, ch. 14, § 1, is part of the law of Nevada. *J. E. Burke & Co. v. Buck*, 31 Nev. 74, 80, 99 P. 1078, 1080 (1909); *Evans v. Cook*, 11 Nev. 69, 75 (1876). The language of the statute is clear to the effect that any instruments or conveyances made to cover gambling losses or to advance money for betting are void and not merely voidable.[2] The same rule applies whether the claim is asserted by a gambling establishment, *Craig v. Harrah*, 66 Nev. 1, 201 P.2d 1081 (1949), or against one, *Weisbrod v. Fremont Hotel, Inc.*, 74 Nev. 227, 326 P.2d 1104 (1958). The taint of a gambling transaction also applies to a check written to cover a gambling loss. *West Indies, Inc. v. First National Bank of Nevada*, 67 Nev. 13, 214 P.2d 144 (1950); *Menardi v. Wacker*, 32 Nev. 169, 105 P. 287 (1909). The rule also prevents an effective assignment of a negotiable instrument. *J. E. Burke & Co. v. Buck*, 31 Nev. 74, 99 P. 1078 (1909).

■ The difficult cases are those in which instruments or conveyances, valid on their face, are asserted to have been made in furtherance of a gambling purpose. The Nevada court has developed certain presumptions to aid the courts' navigation in these unsure waters.

"In determining the purpose [behind the indebtedness], the significance and relevancy of the surrounding circumstances and environment are readily apparent. If the advancement was made in a gambling establishment in full operation, by the proprietor or his agent, to one then, or immediately prior thereto, engaged in gambling and who ran short of money, the game still being in progress, or if his conversation or the circumstances indicated he intended to resume playing, the purpose of the advancement becomes clear. On the other hand, if the advancement was at a different place than a gambling establishment, or if same was not made at a time when the recipient had been recently playing, and some other, legitimate, purpose is stated by the recipient, then no presumption or inference that the advancement was for a gambling purpose is justifiable from such circumstances." *Craig v. Harrah*, 66 Nev. at 6, 201 P.2d at 1084.

In *Wolpert v. Knight*, 74 Nev. 322, 330 P.2d 1023 (1958), the defendant issued a $2,500

---

1. The decisions cover a one hundred year period.

*Corbin v. O'Keefe*, 87 Nev. 189, 484 P.2d 565 (1971) (per curiam); *Wolpert v. Knight*, 74 Nev. 322, 330 P.2d 1023 (1958); *Weisbrod v. Fremont Hotel, Inc.*, 74 Nev. 227, 326 P.2d 1104 (1958) (per curiam); *West Indies, Inc. v. First National Bank of Nevada*, 67 Nev. 13, 214 P.2d 144 (1950); *Craig v. Harrah*, 66 Nev. 1, 201 P.2d 1081 (1949); *Menardi v. Wacker*, 32 Nev. 169, 105 P. 287 (1909); *J. E. Burke & Co. v. Buck*, 31 Nev. 74, 99 P. 1078 (1909); *Evans v. Cook*, 11 Nev. 69 (1876); *Scott v. Courtney*, 7 Nev. 419 (1872).

2. "That all notes, bills, bonds, judgments, mortgages, or other securities or conveyances whatsoever given, granted, drawn, or entered into, or executed by any person or persons whatsoever, where the whole, or any part of the consideration of such conveyances or securities shall be for any money, or other valuable thing whatsoever, won by gaming or playing at cards, dice, tables, tennis, bowls, or other game or games whatsoever, or by betting on the sides or hands of such as do game at any of the games aforesaid, or for the reimbursing or repaying any money knowingly lent or advanced for such gaming or betting as aforesaid, or lent or advanced at the time and place of such play, to any person or persons so gaming or betting as aforesaid, or that shall, during such play, so play or bet, shall be utterly void, frustrate, and of none effect, to all intents and purposes whatsoever."

check to cover five previously issued $500 checks, four of which had been cashed at the cashier's desk and one of which was written to obtain gambling chips. There was testimony that an undetermined amount of the money had been spent gambling, but that other amounts were used to buy drinks, were given to friends, etc. Relying on the *Craig* case, the Court upheld the determination that the defendant was liable as to the $2,000 representing the checks cashed other than at the gaming tables. Thus, the burden of proving a gambling purpose is on the party seeking to avoid liability thereon, but there is a presumption of gambling purpose where the transaction occurs in proximity to the gambling itself in terms of both time and space.

III. *Accrual of Income for Tax Purposes*

■ The determination as to when income is properly recognized for tax purposes is governed by § 451 of the Internal Revenue Code of 1954, 26 U.S.C. § 451. Both parties accept the following rule, taken from the regulations, as the starting point for discussion of the issues in this case:

> "Under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy." Treas.Regs. § 1.451–1(a).

See also Treas.Regs. § 1.446–1(c)(1)(ii). The rule is often referred to as the "all events test." The regulation sets two criteria, both of which must be met if the taxpayer is to be required to include an item in taxable income. First, the right to receive the income must be fixed. Second, the amount of the income must be reasonably ascertainable. In this case, there is no real controversy as to the second prong of the test. Each marker is for a specific dollar amount and there are no contingencies that could alter the amount of the obligation. Moreover, the Flamingo can establish with reasonable accuracy the amount that will ultimately be collected on the markers. The controversy in this case concerns whether or not the markers represent a "fixed right" to receive income. The plaintiff contends that this means a legally enforceable right, while the defendant maintains that it means something less absolute.

The Tax Court of the United States recently had occasion to consider a case involving the same issue with respect to taxation of markers of another Las Vegas casino (Caesars Palace). The case is *Desert Palace, Inc. v. Commissioner*, 72 T.C. 1033 (1979). Based upon some alleged concession therein made by the Commissioner, it appears that the Tax Court held that where a marker given by a patron of a gambling casino would be found to be a gambling debt under state law and therefore unenforceable, such marker would not represent accruable income until actually paid. As explained infra, this Court does not agree with the Tax Court's conclusion and finds it inconsistent with earlier Tax Court decisions discussed infra.

The "all events" test has its origin in an early Supreme Court case dealing with the availability of a deduction for taxes that had not yet been assessed and thus were not due. The Court noted that accrual basis accounting was permitted for income tax purposes to permit taxpayers to "make their returns according to scientific accounting principles," specifically the matching of revenues and expenses. *United States v. Anderson*, 269 U.S. 422, 440, 46 S.Ct. 131, 134, 70 L.Ed. 347, 350 (1926). Rejecting the contention that an expense for taxes could not accrue as a tax deduction until the tax became due and payable, the Supreme Court said:

> "In a technical legal sense it may be argued that a tax does not accrue until it has been assessed and becomes due; but it is also true that *in advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it.* In this respect, for purposes of accounting and of ascertaining true income for a given accounting period, the munitions tax here in question did not stand on any different footing than other

accrued expenses appearing on appellee's books. In the economic and bookkeeping sense with which the statute and Treasury decision were concerned, the taxes had accrued." Id. at 441, 46 S.Ct. at 134, 70 L.Ed. at 351 (emphasis added).

At that point in time, it was clear that accounting for business purposes was essentially accepted as accounting for tax purposes. This view has changed somewhat over the years. Particularly with respect to the principle of matching revenues and expenses, business and tax accounting are recognized as obtaining divergent results in some instances. The main distinction is that tax accounting requires more certainty than does financial accounting. See *Eastman Kodak Co. v. United States*, 534 F.2d 252, 255, 209 Ct.Cl. 365 (1976) (en banc). But it is by no means clear that this distinction turns on the existence or not of legal enforceability.

In *H. Liebes & Co. v. Commissioner*, 90 F.2d 932, 936–38 (9th Cir. 1937), the Ninth Circuit Court of Appeals reviewed the development of the accrual concept for income tax accounting purposes. Courts have used various words and phrases to describe the situation in which accrual of income is proper: "unconditional liability," [3] a "right to payment," [4] "fixed right to receive," [5] "uncontested and certain," [6] and "definitely ascertained as to its amount, and acknowledged to be due." [7] Synthesizing the cases reviewed, the *Liebes* Court concluded:

"From the above expressions, it is apparent that the general definition of [']accrued' is limited when taken in connection with income returns. We may conclude that income has not accrued to a taxpayer until there arises to him a fixed or unconditional right to receive it." 90 F.2d at 937.

What emerges from these statements is that the key concept for accrual of income is that the right to receive income must be *fixed or unconditional.* This comports with the plain meaning of the language used in the regulations. The reference to the occurrence of "all events" seems to denote the absence of a contingency on the right to receive the income.[8]

The plaintiff here argues that the markers do not represent an "unconditional right" to receive income because ultimate collection depends—is contingent—upon a voluntary act of the maker of each obligation. This argument ignores, however, the important distinction between a "right to receive" and actual receipt which forms the very basis for disparate treatment under the accrual and the cash methods of accounting. Certainty of receipt has never been a requirement for the accrual of income. Indeed, the allowance of a deduction to create a reserve for doubtful accounts recognizes that accrued income may never actually be received. In the sense that the plaintiff urges here, no right to receive income would be "unconditional"; there is always the possibility that a given obligation will become uncollectible in one way or another. Indeed, the Supreme Court has expressly held that the intervention of the defense of bankruptcy is not sufficient to preclude recognition of income even when it occurs in the same year as the obligation is incurred. See *Spring City Foundry Co. v. Commissioner*, 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200 (1934). In *Liebes,* supra, the

---

3. *Lucas v. North Texas Lumber Co.*, 281 U.S. 11, 13, 50 S.Ct. 184, 185, 74 L.Ed. 668 (1930).

4. *Continental Tie & Lumber Co. v. United States*, 286 U.S. 290, 295, 52 S.Ct. 529, 530, 76 L.Ed. 1111 (1932).

5. *Spring City Foundry Co. v. Commissioner*, 292 U.S. 182, 184, 54 S.Ct. 644, 645, 78 L.Ed. 1200 (1934).

6. *United States v. Safety Car Heating & Lighting Co.*, 297 U.S. 88, 93–94, 56 S.Ct. 353, 356, 80 L.Ed. 500 (1936).

7. *Lichtenberger-Ferguson Co. v. Welch*, 54 F.2d 570, 572 (9th Cir. 1931).

8. In a slightly different context (the determination of a decedent's taxable income), the Fourth Circuit speaks of the absence of a contingency as an important element of accruable income and notes that "fixed" is to be contrasted with "inchoate" and "in the process of becoming." *Helvering v. McGlue's Estate*, 119 F.2d 167, 170 (4th Cir. 1941).

Ninth Circuit concluded that, given a fixed or unconditional right to receive income, accrual is proper so long as there is a *"reasonable expectancy"* that the income will be ultimately received in the form of cash or its equivalent. 90 F.2d at 937–38. Although this creates an exception to the general accrual principles in those situations in which there is no reasonable expectancy of collection, it is clear that the uncertainty as to collection must be substantial and not simply technical. The exception is strictly construed. See *Stephens Marine, Inc. v. Commissioner*, 430 F.2d 679, 685 (9th Cir. 1970).

Of the cases cited by the plaintiff for the proposition that legal enforceability is a requirement for the accrual of income, only three actually use the word "enforceable" in that context. In *Maryland Shipbuilders & Drydock Co. v. United States*, 409 F.2d 1363, 1367, 187 Ct.Cl. 523 (1969), it was said:

> "When the cases speak of 'a fixed right to receive' an amount as the touchstone of its accruability for federal tax purposes, they plainly comprehend a 'right' *that is enforceable with no strings attached*—not a 'right' the exercise of which must be purchased by the beneficiary with the surrender of some other related and valuable right such as, in this case, the right to pursue the possibilities for an additional recovery under the SRL policies." (emphasis added.)

The key portion of this excerpt is "with no strings attached" and not the word "enforceable." That case involved the recognition as income of insurance proceeds to cover lost earnings. The taxpayer's loss was covered by multiple policies and the insurer had offered to pay the "total loss" amount under one policy in return for an agreement from the taxpayer to forego any recovery under other policies. The Commissioner had sought to include that amount in the taxpayer's income as an accrued item. The Court of Claims decided that there was no "fixed right" to receive that income because the recovery was still subject to determination either through negotiations or by resort to the courts. The basis of the decision was *not* that the tax-payer did not have an "enforceable right" to the amount in question. Indeed, it may well have been that there was a "legally enforceable" obligation on the part of the insurer. But that recovery was not settled and therefore not sufficiently certain to justify accrual for tax purposes.

In a somewhat earlier case, the Court of Claims asserted that "[t]he cases uniformly agree that before an item of income may be accrued, there must be a fixed, determined and enforceable right to receive a reasonably ascertainable amount." *Breeze Corps., Inc. v. United States*, 117 F.Supp. 404, 407, 127 Ct.Cl. 261 (1954). Examination of the cases cited in the footnote to this statement reveals not a single case holding legal enforceability to be a necessary element of a "fixed right" to receive income. The *Breeze* case itself turned on the fact that the amount of income due the taxpayer on a procurement contract was subject to redetermination by the Navy before final settlement was made.

Finally, the language of *Cuba Railroad Co.*, 9 T.C. 211 (1947), seems to indicate that enforceability is necessary for the accrual of income. There, the taxpayer had fully rendered services under contract with the Cuban government, which admitted the existence of the full liability. Nevertheless, the Cuban legislature consistently appropriated an amount insufficient to cover all obligations of the government. The amount appropriated for transportation services was apportioned among various carriers. There was no means of enforcing the full amount of the debt. The Tax Court said:

> "The petitioner had an unenforceable claim. Collection was apparently at the mercy of the political whims of future Cuban administrations. The evidence as a whole shows that there was real doubt and uncertainty at the end of the taxable year as to whether any of the amount due and unpaid would ever be paid. A tax-payer, in such circumstances, is not required to accrue an item like this as income and pay income tax thereon, but is permitted to wait until the uncertainty is removed in some way." 9 T.C. at 215.

Considering the context of this reference to enforceability, however, indicates that this case falls within the area in which there is no reasonable expectancy that the contract price would be recovered. Therefore, under the *Liebes* standard, it was not accruable as income. Unenforceability was simply a factor contributing to the "doubt and uncertainty" as to the expectancy of ultimate collectibility. It is also significant that the Court spoke of *"real"* uncertainty.

■ While it might be possible to distinguish each of the cases relied on by the plaintiff, a completely satisfactory treatment would require a tedious exposition of factual material and legal reasoning that would be too lengthy to warrant the effort. Briefly, however, those cases in which income was determined not to be accruable fall into three basic categories: (1) those in which the taxpayer still had to perform some act in order to bind the other party to the obligation,[9] (2) those in which the claim to income was the subject of *actual* controversy, either as to liability or amount, during the taxable year in question,[10] and (3) those in which contractual income was subject to final determination upon completion.[11] This case fits into none of these groupings. In some cases in the last two categories, it is clear that the courts did not adequately distinguish between the two parts of the test for accrual of income. Although some cases speak in terms of "fixed rights," it is clear that the real issue in the case involves the extent to which the amount is reasonably ascertainable.

In contrast with those cases cited by the plaintiff, there are cases that have expressly held that legal enforceability is not a prerequisite to the accrual of income.[12]

The case most closely analogous to the one presently before the Court involved the accrual of usurious interest. In *Barker v. Magruder*, 68 App.D.C. 211, 95 F.2d 122 (D.C.Cir.1938), the Court held that the lender must accrue as income the amount of

---

9. *Lucas v. North Texas Lumber Co.*, 281 U.S. 11, 50 S.Ct. 184, 74 L.Ed. 668 (1930) (no unconditional liability on an executory contract for sale of property until closure); *C. A. Durr Packing Co. v. Shaughnessy*, 81 F.Supp. 33 (N.D.N.Y.1948), aff'd per curiam, 189 F.2d 260 (2d Cir. 1951), cert. denied, 342 U.S. 850, 72 S.Ct. 78, 96 L.Ed. 641 (1951) (statute on which claim was based required "establishment" of the right in administrative proceedings).

10. *United States v. Safety Car Heating & Lighting Co.*, 297 U.S. 88, 56 S.Ct. 353, 80 L.Ed. 500 (1936); *North American Oil Consolidated v. Burnet*, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197 (1932); *Commissioner v. Henry Hess Co.*, 210 F.2d 553 (9th Cir. 1954); *H. Liebes & Co. v. Commissioner*, 90 F.2d 932 (9th Cir. 1937); *Maryland Shipbuilders & Drydock Co. v. United States*, 409 F.2d 1363, 187 Ct.Cl. 523 (1969); *Foster Wheeler Corp.*, 20 T.C. 15 (1953); *Georgia School-book Depository; Inc.*, 1 T.C. 463 (1943) (dicta).

11. *United States Cartridge Co. v. United States*, 284 U.S. 511, 52 S.Ct. 243, 76 L.Ed. 431 (1932); *Stephens Marine, Inc. v. Commissioner*, 430 F.2d 679 (9th Cir. 1970); *United States v. Harmon*, 205 F.2d 919 (10th Cir. 1953); *Marquardt Corp.*, 39 T.C. 443 (1962); *Globe Corp.*, 20 T.C. 299 (1953). Cf. *Cuba Railroad Co.*, 9 T.C. 211 (1947) (amount actually payable by debtor subject to redetermination despite admitted liability for full contract price).

12. In a recent en banc decision, the Court of Claims explicitly disavowed any requirement of legal enforceability with respect to deductions for accrued expenses:

". . . . The 'all events' test . . . looks to a liability that is so fixed that the fact of liability is certain and the amount thereof reasonably ascertainable, *although not necessarily legally enforceable.* The 'all events' test thus allows deductions when the taxpayer has a special kind of knowledge which gives him enough facts to demonstrate the absolute necessity of paying an expense at some future date without regard to such matters as actual payment taking place, existence of legal liability, or accrual." *Eastman Kodak Co. v. United States*, 534 F.2d 252, 257, 209 Ct.Cl. 365 (1976) (emphasis added).

The "all events" test applicable to deductibility of expenses is similar to that for recognition of income. See Treas.Regs. § 1.461–1(a)(2).

The Tax Court has also rejected the argument that legal enforceability is a prerequisite to deduction of accrued expenses. In a case involving a corporate resolution to pay a widow's pension, that Court said:

"there is no requirement that there must be an underlying legal liability before a definite and fixed obligation to make an expenditure can qualify as an accrued 'ordinary and necessary' business expense . . . ." *Champion Spark Plug Co.*, 30 T.C. 295, 298 (1958).

interest due on the face of a note, despite the fact that under the usury statute of the District of Columbia the lender was entitled only to the return of the principal and no interest whatsoever. The Court concluded that "[t]he correct answer . . . depends not so much . . . upon the legal right to enforce collection as upon the existing probability of its being received." 68 App.D.C. at 212, 95 F.2d at 123. In an almost identical case, involving the same lender, the Court of Claims followed the Circuit Court and said: "[T]axability is not affected because of its illegality. If in a subsequent year the amount becomes uncollectible or a loss is sustained in respect thereof, a deduction on account thereof is then allowable." [13] *Barker v. United States*, 26 F.Supp. 1004, 1006 (Ct.Cl.1939).[14] The Court of Claims reasoned that the usury statute was enacted as a protection for borrowers and that the taxpayer should not be permitted to invoke his own wrongdoing as a means of avoiding taxes that would be due in the absence of the statute.

**13.** The availability of an offsetting deduction for uncollectible accounts is important in that it satisfies the need to construe the tax law in an unoppressive way while maintaining the concept of the calendar (or fiscal) year of accounting. But even in a situation where such a deduction would have been unavailable, the Sixth Circuit Court of Appeals refused to adopt a legal enforceability requirement urged by the taxpayer. In *Knight Newspapers v. Commissioner*, 143 F.2d 1007 (6th Cir. 1944), the taxpayer argued that a dividend declared in violation of state law and contrary to the terms of the declaring corporation's preferred stock certificates was at least voidable, if not void, and therefore not properly accruable. The taxpayer had in fact been required to return the dividend during the subsequent year. Moreover, recognition of the income represented by the dividend would have resulted in the assessment of a personal holding company surtax, which would not be recoverable by deduction in a subsequent year. Nevertheless, rather than adopt the "legal unenforceability" rationale urged by the taxpayer, the Sixth Circuit invoked the constructive trust doctrine to avoid an unjust result. But the Court intimated that a different result might well inhere where there was no similar potential for injustice.

"It was said [in *National City Bank v. Helvering*, 98 F.2d 93, 96 (2d Cir. 1938)] that 'although taxes are public duties attached to

In *Travis v. Commissioner*, 406 F.2d 987 (6th Cir. 1969), the taxpayer failed to accrue as income installments due on contracts for services that had yet to be performed. The taxpayer argued that applicable state law precluded recovery on executory contracts and therefore there was no fixed right to receive the income. The Sixth Circuit rejected the argument that the rule required a legally enforceable right. The Court recognized that precedent it relied on was less than ironclad, but adopted the rule of *Barker v. Magruder*, supra.

"We do not believe that when the Supreme Court spoke of 'the right to receive income' in an accrual method of accounting income tax case that it intended to equate that phrase in all respects with 'a legally enforceable right to receive income.' In *Commissioner of Internal Revenue v. Hansen*, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1959), the Supreme Court specifically rejected a contention that a 'presently enforceable right to recover' was essential to require inclusion of income. The Court said:

the ownership of property, the state should be able to exact their performance without being compelled to take sides in private controversies,' and also that 'collection of the revenue cannot be delayed, nor should the Treasury be compelled to decide when a possessor's claims are without legal warrant. If he holds with claim of right, he should be taxable as an owner, regardless of any infirmity of his title; no other doctrine is practically possible, and no injustice can result.' " 143 F.2d at 1009.

Of course, the *National City Bank* case stands for the familiar "claim of right" doctrine applicable to situations in which money or its equivalent is actually received, and therefore is arguably inapplicable to the issue of accrual of income. The rationale, however, is clearly applicable: in the absence of potential injustice, the administration of the tax laws of the United States should not include inquiry into the legal validity of taxpayers' claims on assets.

**14.** See also *Tharp v. Commissioner*, 31 T.C.M. (CCH) 22 (1972) (while not at issue in the case, unenforceable usurious interest was accrued and returned as income); *Herberger v. Commissioner*, 9 T.C.M. (CCH) 542 (1950), aff'd, 195 F.2d 293 (9th Cir. 1952) (accrual required despite unenforceability due to price in excess of governmentally imposed price ceilings).

'But the question is not whether the taxpayers can presently recover their reserves, for, as stated, it is the time of acquisition of the *fixed right to receive* the reserves and not the time of their *actual receipt* that determines whether or not the reserves have accrued and are taxable.' *Commissioner of Internal Revenue v. Hansen,* supra at 464, 79 S.Ct. at 1280. (Emphasis in original.)

"We recognize, of course, that this language taken in context might be argued as expressing rejection primarily of the term 'presently.' But we regard it as significant also that the Court having before it the term 'enforceable right to recover' did not adopt such language and did emphasize the term 'fixed right to receive.'

"There are so many practical problems which would be engendered in tax cases if the term 'legally enforceable' was employed that we tend to construe the choice of language referred to above as significant.

"We agree with the United States Court of Appeals for the District of Columbia . . . ." 406 F.2d at 989–90. The Court noted that to hold otherwise would ignore the realities of the situation.

"This court, in a quite different income tax case, set this standard for interpretation of relevant facts, 'the transaction must be viewed as a whole and in the light of realism and practicality.' *Commissioner of Internal Revenue v. Segall,* 114 F.2d 706, 709 (6th Cir.), cert. denied, 313 U.S. 562, 61 S.Ct. 838, 85 L.Ed. 1522 (1940).

"Appellants wrote these contracts for dance lessons so as to convince their patrons that they assumed a binding obligation for the payment, whether the lesson had ever been given or not. This record indicates that many such payments were made in accord with the terms of the contracts. It appears, in fact, that appellants rarely had recourse to litigation. We believe that under the language of the contracts the right to income became fixed for accounting purposes under the accrual method when the payments became due and payable under the terms of the contract. Failure to include such accounts as income when they were due and payable meant that appellants' tax return failed clearly to reflect income." 406 F.2d at 990 (footnotes omitted).

In *Schlude v. Commissioner,* 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963), the Supreme Court required accrual of income under a similar contract. The Supreme Court did not address, however, the issue of "legal enforceability" apparently because the issue was raised for the first time on appeal. 406 F.2d at 989.

■ If anything is clear from the foregoing cases, it is that the courts have not developed a formula that can be applied mechanically to any given fact situation to determine whether accrual is proper or not. Rather, the courts have attempted to apply the "all events" test in a manner that recognizes the realities of a given transaction. As one court noted, whether a right is fixed and the amount thereof determinable depends upon "a practical rather than a legal test." *C. A. Durr Packing Co. v. Shaughnessy,* 81 F.Supp. 33, 36 (N.D.N.Y.1948), aff'd per curiam, 189 F.2d 260 (2d Cir.), cert. denied, 342 U.S. 850, 72 S.Ct. 78, 96 L.Ed. 641 (1951).

IV. *Accrual of Income from Gambling on Credit*

Aside from the recent *Desert Palace* case, there is only one reported federal case that has dealt directly with any tax effect of a gambling debt. *United States v. Hall,* 307 F.2d 238 (10th Cir. 1962), involved the settlement of a gambling debt incurred in a Las Vegas casino. The taxpayer had borrowed large sums of money with which to gamble on the basis of a guarantee of one of the owners of the casino. The casino owner had settled the debt with the casino and the taxpayer transferred an interest in a cattle herd to the casino owner in settlement between them. The controversy arose as to whether the taxpayer must report as income the amount by which the debt exceeded his basis in the cattle. The Court,

however, treated the transaction as if the cattle had been sold at fair market value and the cash proceeds of the sale had been used to pay off the gambling debt, the amount of which was the subject of some controversy.

The plaintiff asserts that the Tenth Circuit in *Hall* ruled that a gambling debt is a nullity for tax purposes. This characterization plainly goes too far. While the Court did say that the amount of the gambling debt had "no significance for tax purposes," that conclusion was expressly limited to the circumstances of that particular case. 307 F.2d at 242. Moreover, the Court went on to say:

> "The elimination of a gambling debt is, however, a transaction that may have tax consequences independent of the *amount* of the debt and certainly cannot be used as a tool to avoid a tax incident which is shielded only by the screen of its unenforceable origin."

Id. (emphasis in original.)

In relying on the holding of *Hall*, the Government has argued that the Flamingo's income arises from the cancellation of indebtedness every time the casino wins one of the chips given out in exchange for the markers. Despite the Government's novel, though convoluted, theory, *Hall* is simply inapplicable to the case presently before the Court. That case involved a gambling debt transaction which in no way resembles the creation of a marker. First of all, it deals with the settlement of the loan. Second, it deals with the transaction from the perspective of the debtor, rather than the creditor. What would really interest this Court is how the casino in *Hall* treated the gambling income. Finally, the Government's argument only serves to complicate matters. The chips are as unenforceable as the mark-

ers and therefore the shift of focus does nothing to eliminate the conceptual difficulty of the issue. Indeed, it was the extinguishment of an unenforceable obligation that gave the Tenth Circuit such problems. Moreover, it is fatuous to characterize the cancellation of the chip "indebtedness" as a sale at fair market value of "gambling services," even ignoring the problems such valuation might entail. In sum, the Government's new theory stretches the "cancellation of indebtedness" doctrine far beyond its reasonable application. This goes directly against the rationale of *Hall* that warns against applying "mechanical standards which smother the reality of a particular transaction." 307 F.2d at 241. The use of chips in the gaming area is merely a convenience; the existence of any "liability" on them is, as the plaintiff points out, "transitory." The existence of this temporary debtor-creditor relationship is important only at the beginning and end of the accounting period. The method of accounting for income employed by Flamingo completely accounts for this effect of the chips on income.[15] The most which can be said for the Government's argument is that it shows, from another perspective, that the Flamingo's income is generated at the time the gambling occurs, not when a marker is either executed or paid. This does not, however, solve the tax accounting problem of determining at what point that income must be recognized.

 The *Hall* decision does, however, provide a good starting point for the discussion of the issue before this Court. While the factual setting of *Hall* is entirely different from that here, the Tenth Circuit seized upon an important policy consideration that is applicable to the issue of accruing marker

---

**15.** The chips are important in the calculation of gross gaming revenue for two reasons. First, all bets lost by the casino are paid out in chips, and therefore revenue may be calculated without requiring all gamblers to cash the chips at the close of the accounting period. Second, chips also provide an offset against the amount of the "drop" that has not actually been won by the casino. Both of these amounts are accounted for in the calculation of the "fill."

Thus, outstanding chips have no theoretical effect on the casino income. There may be an incidental effect, however, if chips are never redeemed because they are irretrievably lost, destroyed or retained as a souvenir or good luck token. The Government has not suggested how the amount of any such income due to "leakage" from the casino bankroll might be calculated.

income. That principle is that the mere fact of "legal unenforceability" should not be used as a means to avoid an otherwise applicable tax incident. This is related to the rationale of *Barker v. United States,* supra, that a taxpayer should not be allowed to take advantage of his own wrongdoing in order to avoid taxation. While the Nevada courts have never cogently explained the rationale behind their continued adherence to the old English statute regarding gambling indebtedness, and despite the fact that such a rule seems strangely incongruous in light of Nevada's economic dependence upon its gaming industry, the existence of the rule indicates that gambling on credit, or the facilitation thereof, is considered morally reprehensible and thus constitutes wrongdoing. Like the usury statute in *Barker,* the unenforceability of gambling debts is for the protection of the public. Thus, the Flamingo should not be allowed to use the rule to further shield its unsanctioned operations from the normal incidents of the United States tax laws.

On the other hand, there seems to be something inherently unfair about imposing taxes on "income" that may never be received. This objection is met, however, by the availability of a bad debt or loss deduction if the receivable actually becomes uncollectible. See *Barker v. United States,* supra. The Government here has allowed a deduction to create a reserve for doubtful accounts in accordance with regular accrual accounting principles. There is nothing to indicate that should the reserve prove inadequate, additional future deductions would not be allowed to eliminate the potential for injustice. Moreover, in cases of other types of wrongdoing, such as embezzlement or fraud, the "claim of right" doctrine is consistently applied to require recognition of clearly illegal income to which the taxpayer has no legitimate claim and indeed may have to return. See, e. g., *National City Bank v. Helvering,* 98 F.2d 93 (2d Cir. 1938).

Applying the principles enunciated by the Ninth Circuit in *H. Liebes & Co. v. Commissioner,* supra, to the facts of this case, viewed "in the light of realism and practicality," it seems clear that the Flamingo has a fixed right to receive the income represented by the casino receivables within the meaning of the "all events" test and should be required to accrue the income represented by them. The claim is completely unconditional and there is a "reasonable expectancy" that the income will be collectible. As discussed above, it is only the actual receipt of the income that is contingent. The claim is for a sum certain, payable on demand or, in the case of some agreements between the Flamingo and certain makers, within a short period of time, usually thirty days or less. There are no events the occurrence of which could alter the amount that is due the casino or the fact of liability.[16] The markers were in the form of counter checks which would indicate to makers that their execution resulted in a binding obligation. Indeed, the evidence suggests that if the Flamingo were able to magnetically encode the counter checks, the markers would be collectible through normal banking channels unless the maker issued a stop payment order. The fact that the casino is willing to conduct a significant, even essential, portion of its gaming business on the basis of credit indicates that they expect to ultimately receive payment in the form of cash or its equivalent. The existence of this expectancy is also evidenced by the Flamingo's careful credit investigation that precedes the granting of any credit at the casino and the existence of collection procedures short of resort to the courts. The collection experience of the Flamingo, with a collection rate well in excess of ninety percent, indicates that the expectation is "reasonable." Finally, failure to include the markers in income would mean that the Flamingo's income tax return would not clearly reflect

16. "Liability" as it is used here simply denotes the debtor-creditor relationship between the maker of the marker and the casino. While "liability" often connotes a legally enforceable relationship, particularly when used as a legal term, it has a more general meaning that applies to less binding obligations. The word "right" has similar semantic problems that inevitably have led to some confusion in the interpretation of the "all events" test.

income.[17] To the extent that the markers represent winnings of the casino, failure to include them in income would understate the revenue generated during the taxable period. To the extent that the markers are still advances,[18] the calculation of gross gaming revenues is distorted because, whereas the "drop" is essentially reduced by the amount of the marker, there is no corresponding adjustment of the "fill" to take into account the amount that represents chips still in the hands of the gambler on account of the advance. Short of calling on all gamblers to "settle up" as part of the close of the accounting period, it would be impossible to correct this distortion.

This Court holds, therefore, that the income represented by the casino receivables is accruable under the "all events" test. In so holding, this Court determines that legal enforceability is not a necessary element of a fixed right to receive income. Such being the case and there being no genuine issues ·of material fact, defendant's motion for summary judgment is granted, and plaintiff's motion for partial summary judgment is denied.

Let judgment be entered accordingly.

---

17. The Government seems to argue that, even if normal accrual principles would not require recognition of the income represented by the casino receivables, § 446(b) of the Internal Revenue Code permits the Commissioner to require the accrual in order to "clearly reflect income." This argument appears to go too far. Section 446 provides for selection by the taxpayer of a method of accounting, and § 446(b) only allows the Commissioner to require that the method selected clearly reflect income. There is no real argument that the Flamingo improperly selected the accrual method, and the Government has not suggested that there is an alternative *method* that could require recognition of the income in question here prior to the time the accrual method would. Exact matching of revenues and expenses, while the goal of financial accounting principles, is not a requirement of the tax law. See *Eastman Kodak Co. v. United States*, 534 F.2d 252, 257–58, 209 Ct.Cl. 365 (1976); *Marquardt Corp.*, 39 T.C. 443, 453–55 (1962).

Nevertheless, "clear reflection of income" is a factor that may be considered in determining the proper application of accrual principles as part of the necessity to view the reality of a transaction. See *Travis v. Commissioner*, 406 F.2d 987, 990 (6th Cir. 1969).

18. Clearly, the Flamingo's income arises only as the result of gambling transactions themselves, not by advancing money for gambling. It is only because of the nature of the casino accounting system that the markers necessarily enter the income calculation.

The markers would only represent advances where the maker was still at the resort, and probably still in the gaming area.